Enrico DI PORTANOVA

v.

**The UNITED STATES.**

No. 404–80T.

United States Court of Claims.

Sept. 22, 1982.

I.

Stanford G. Ross, Washington, D. C., attorney of record, for plaintiff. Alice Armitage Colburn, Califano, Ross & Heineman and Jeffrey M. Glosser, Washington, D. C., of counsel.

Bruce W. Reynolds, Washington, D. C., with whom was Asst. Atty. Gen. Glenn L. Archer, Jr., Washington, D. C., for defendant. Theodore D. Peyser, Jr., Washington, D. C., of counsel.

Before FRIEDMAN, Chief Judge, and KASHIWA and BENNETT, Judges.

## ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT

FRIEDMAN, Chief Judge:

The ultimate question in this case is whether the plaintiff, a dual United States-Italian citizen by birth who renounced his United States citizenship in 1972, was entitled to be taxed upon income he received in 1973 from trusts, at the flat rate of 30 percent that section 871(a) of the Internal Revenue Code of 1954, 26 U.S.C. § 871(a) (1976), imposes upon United States source income of a nonresident alien who is not engaged in a trade or business in the United States. The answer depends upon two other issues: (1) whether the plaintiff, through the trusts, was "engaged in trade or business within the United States," I.R.C. § 871(b); and (2) if not, whether his expatriation had as "one of its principal purposes the avoidance of taxes." I.R.C. § 877(a).

The plaintiff has moved for summary judgment on all issues. The defendant has moved for summary judgment on the trade or business issue. We hold for the plaintiff on the trade or business issue. We hold for the defendant on various aspects of the expatriation issue and remand to the Trial Division to determine the purpose question under that issue.

A. The plaintiff's grandfather was H. R. Cullen, a wealthy Texas oilman. Cullen was one of the principal oil developers in Texas and Louisiana and secured many oil and gas leases there. An oil and gas lease gives the leaseholder the exclusive right to extract the minerals from the land for as long as the land will produce. Generally, a bonus and a one-eighth royalty are given to the landowner in exchange for the lease. These leases are called "working interests" because the leaseholder has the right to extract the oil and gas. The landowner could keep the working interest for himself, but landowners usually transfer the working interests to persons with expertise in the oil and gas business.

In order to finance the development of these leases, Cullen transferred an undivided 50 percent interest in the leases to Humble Oil & Refining Company, to which Exxon Corporation is the successor. Cullen operated the oil fields through a management company, Quintana Petroleum Corporation ("Quintana"). Quintana entered into agreements with the leaseholders to operate the fields. The leaseholders' working interests then became nonoperating working interests because Quintana had the operating responsibility.

Toward the end of Cullen's life, he and his wife endowed several trusts with fractional oil and gas interests in favor of their descendants. The plaintiff is a beneficiary of five of these trusts. His mother subsequently created a sixth trust for him. He also has a net profits interest in certain leases.

In order to maintain efficient, centralized management of the oil and gas interests, the trusts entered into operating agreements with Quintana, giving it extensive control over the operations. The various trusts, Exxon, and Quintana also have entered into unit operating agreements with non-Cullen working interest owners.

The plaintiff's relations with other descendants of Cullen have never been good.

In 1967, the plaintiff sued for an accounting of the trusts, but the case was settled in 1968. As part of the settlement, independent trustees were appointed, the plaintiff's income was increased, and the plaintiff agreed not to challenge Quintana's operations of the leases or to try to terminate the operating agreements without a showing of fraud or gross negligence in Quintana's operations.

In 1980, the plaintiff instituted another suit for an accounting of the trusts and Quintana's assets and operations. That case is pending in the Texas courts.

B. The plaintiff's mother married an Italian citizen. The plaintiff was born in the United States, which gave him dual United States-Italian citizenship.

In 1972, the plaintiff, by a written sworn statement executed in Rome, formally renounced his United States citizenship pursuant to section 349(a)(6) of the Immigration and Nationality Act, 8 U.S.C. § 1481(a)(6) (1970) (now at 8 U.S.C. § 1481(a)(5) (Supp. IV 1980)). In 1973, the plaintiff resided in Italy.

C. In 1973, the plaintiff received $901,-448 from the trusts. He paid on this income the flat tax of 30 percent that section 871(a) of the Code imposes on the United States source income of a nonresident alien who is not engaged in a trade or business in the United States. In 1980, the Internal Revenue Service assessed a deficiency on the ground that the trust income was taxable at the higher rates for income "effectively connected with the conduct of a trade or business." I.R.C. § 871(b).

The plaintiff paid the deficiency and filed a timely claim for refund. After the Internal Revenue Service denied the refund, the plaintiff filed the present suit. He contends that in 1973 he was not engaged in a trade or business or, if he was so engaged, the income is exempt from tax under the Convention on Double Taxation, March 30, 1955, United States-Italy, art. III, para. 1, 7 U.S.T. 2999, 3004, T.I.A.S. No. 3679. The government has conceded that, under some of the operating agreements, the trusts are not engaged in a trade or business. It

asserts that, under other operating agreements, the trusts are engaged in the oil business. It seeks additional discovery about operations under still other agreements.

The government argues further that one of the principal purposes of the plaintiff's renunciation of his United States citizenship was the avoidance of taxes—a fact that under section 877(a) of the Code would bar him from obtaining the 30 percent tax rate and would subject his trust income to the regular graduated rates. The government seeks a trial on the tax avoidance issue. The government also seeks offsets reflecting (1) the late filing of the plaintiff's return, I.R.C. §§ 6072(c), 6651(a)(1), and (2) the disallowance of some deductions the plaintiff took for the oil and gas business. The plaintiff argues that as a matter of law section 877 does not apply to him, disputes the first offset, and is willing to concede the second if he prevails on the trade or business issue.

## II.

Under section 871(a), a nonresident alien is taxed at a flat rate of 30 percent of his United States income that is not effectively connected with the conduct of a trade or business. Under section 871(b), a nonresident alien engaged in trade or business within the United States is taxed at ordinary graduated rates on the income effectively connected with the conduct of the trade or business. A beneficiary of a trust is deemed to be engaged in a trade or business if the trust is so engaged. I.R.C. § 875(2). Therefore, the first inquiry is whether the plaintiff's trusts were engaged in a trade or business. *See* I.R.C. § 864(c)(1)(B).

Each trust owns several leases, and it is easier to discuss this issue by leases than by trusts. There are five categories of leases involved in this case: (A) Texas leases subject to a general operating agreement with Quintana, (B) Texas leases subject to a unit operating agreement with Quintana, (C) Louisiana leases subject to a general oper-

ating agreement with Quintana, (D) Louisiana leases subject to a unit operating agreement with Quintana, and (E) Texas leases not subject to an agreement with Quintana. The plaintiff also has a net profits interest. The government has conceded that the trusts are not engaged in a trade or business with respect to the first set of leases, but we discuss that category to explain our decision on the other categories.

A. 1. In 1953, the owners of the Cullen working interests in Texas, Humble Oil, and Quintana entered into an operating agreement. Quintana was given

> exclusive charge, control and supervision of all operations of every kind to be conducted upon the property covered by [the] leases . . ., or any of them, for the development, production, treating and handling of oil, gas and other minerals . . ., as well as the payment of royalties and taxes . . ., and other charges which may arise or become due.

The lease owners were to be consulted on matters of general policy, which, in practice, has been such things as a new gas contract and the unit agreement. The expenses of the operations Quintana conducts are charged proportionately to the lease owners. The lease owners, in turn, are entitled to receive their share of oil and gas in kind. In practice, Quintana negotiates the sale of these items, but it is not done under the operating agreement. *See generally* I.R.C. § 761; Treas.Reg. § 1.761–2(a)(3).

A lease owner who is dissatisfied with an action of Quintana may submit the dispute to arbitration by a panel of three arbitrators, one of whom will be appointed by Quintana and one by Exxon. The most the arbitrators may do is remove the operator, but only Quintana or Exxon can be the new operator. If at least 50 percent of the leaseholders wish to remove the operator, they can do so, but again, only Quintana or Exxon can be the new operator. The plaintiff's trusts own a minor portion of the leases.

The operating agreement is contained in a covenant running with the land which does not provide for a leaseholder to withdraw from the agreement.

A new agreement was signed in 1965 and amended in 1967. It applies to all the leases the 1953 agreement covers and to some new land, but does not include Exxon. The new agreement is expressly subject to the 1953 operating agreement. The only significant difference is that a nonoperator, not Exxon, may choose an arbitrator in disputes with Quintana. The amendment also provides that other agreements respecting the leases can be made with Quintana's consent.

The plaintiff and the plaintiff's trusts have no interest in or control over Quintana. It is run by other descendants of H. R. Cullen.

The trusts engage in only limited activities. They pay the bills for expenses received from Quintana and receive the checks from the sale of the oil and gas. Occasionally Quintana consults them on matters of general policy, but usually the details of these matters have been worked out already and the trusts are just shown or told about the arrangements. Quintana finally approves them. The trusts sign other documents, showing their percentage interests, which Quintana gives to third parties. The trusts also receive production reports.

2. In the leading case on what constitutes a trade or business, *Higgins v. Commissioner,* 312 U.S. 212, 61 S.Ct. 475, 85 L.Ed. 783 (1941), the Supreme Court said: "To determine whether the activities of a taxpayer are 'carrying on a business' requires an examination of the facts in each case." *Id.* at 217, 61 S.Ct. at 478. The Court held, however, that mere investing, including the active management of one's investments, is not the carrying on of a business. *Id.* at 218, 61 S.Ct. at 478; *cf. Whipple v. Commissioner,* 373 U.S. 193, 83 S.Ct. 1168, 10 L.Ed.2d 288 (1963) (organization of personal corporations not a trade or business).

The question whether particular activities related to transactions entered into for profit constitute a trade or business arises frequently in real estate matters

where the ownership of property may be either a business or an investment. The passive ownership of rental property is not a business, *Neill v. Commissioner,* 46 B.T.A. 197 (1942), while active management of the property is a business. *Pinchot v. Commissioner,* 113 F.2d 718 (2d Cir. 1940). "What was done was more than the investment and re-investment of funds in real estate. It was the management of the real estate itself for profit." *Id.* at 719.

In this respect, an oil lease is similar to real estate. "Whether coownership in a mineral lease constitutes the carrying on of a 'trade or business' is dependent upon all the facts and circumstances in the particular case." Rev.Rul. 58–166, 1958–1 C.B. 324, 325.

■ The oil and gas business is complex. "The proper development of an oil and gas lease requires a high degree of skill and discretion." Rev.Rul. 58–166, 1958–1 C.B. at 326. To be engaged in the oil business requires active involvement, personally or through an agent, in the operation of that business. *Cataphote Corp. v. United States,* 210 Ct.Cl. 125, 143–46, 535 F.2d 1225, 1235–37 (1976); *Wier v. Enochs,* 64–1 U.S.T.C. ¶ 9387 at 92,009, 92,011 (S.D.Miss.1963), *aff'd per curiam,* 353 F.2d 211 (5th Cir. 1965); *Nemours Corp. v. Commissioner,* 38 T.C. 585, 601 & n.3 (1962) *aff'd per curiam,* 325 F.2d 559 (3d Cir. 1963); *John Provence # 1 Well v. Commissioner,* 37 T.C. 376 (1961), *aff'd,* 321 F.2d 840 (3d Cir. 1963).

■ 3. The government properly has conceded that the activities of the trusts regarding the properties subject to the 1953 and 1965 agreements do not constitute a trade or business and we so hold. The activities are functionally indistinguishable from the mere receipt of income from investments and the payment of expenses incidental to that receipt. The trusts do not manage or control the field operations or participate actively in them. Indeed, the agreements give Quintana exclusive control over "all operations of every kind." The trusts have little power under the agreements. Moreover, in view of their meager percentage of the total interest and the

plaintiff's estrangement from the Cullen family, they also have virtually no informal influence over the operations.

Although the trusts have the right to receive their actual share of the oil and gas produced and Quintana negotiates the sale of the minerals as an agent of the trusts, the Service by its concession recognizes that this is not enough to constitute a trade or business. Considering all the circumstances, we hold that the trusts' activities under the 1953 operating agreement and its amendments did not constitute trade or business.

■ B. In 1970, three of the trusts entered into a unit agreement and a unit operating agreement covering some of the Texas leases. To achieve the most efficient secondary production from an oil field, it is necessary to operate the field as a single entity. Since oil fields rarely have just one owner, several owners must unite their interests under one operator. In the unit agreement all the interest owners unite their interests. The unit operating agreement states who will operate the field and how.

The unit agreement here included the three trusts, other Cullen interests, Exxon, and the non-Cullen operating interests. Under the unit operating agreement, Quintana was the operator of the field.

Unlike the 1953 and 1965 operating agreements, the unit operating agreement gave the owners of the oil and gas interests and not Quintana ultimate authority over the operation of the oil property. It provided that these owners

shall exercise overall supervision and control of all matters pertaining to Unit Operations pursuant to this agreement and the Unit Agreement. In the exercise of such authority, each Working Interest Owner shall act solely in its own behalf in the capacity of an individual owner and not on behalf of the owners as an entirety.

The interest owners are responsible for and take charge of, among other matters, the method of operations, the drilling of wells,

well recompletion, expenditures, disposition of equipment, court appearances, audits, inventories, technical services, removal of the operator, enlargement of the Unit Area, adjustment of investments and termination of the unit agreement.

Owners with a combined interest of ten percent or more may call meetings of all the owners. A 75 percent interest vote is required to decide questions. A 60 percent interest vote is required to remove the operator.

The owners have access to the area and to all reports, logs and other information. No expenditures of more than $5,000 may be made without the interest owners' approval. The owners are liable, proportionately, for all rent, labor costs, employee benefits and most other costs. The owners have reserved to themselves all rights not expressly granted to the operator. Owners may withdraw from the agreement, although the agreement is a covenant running with the land.

Quintana, however, has the exclusive right and duty to conduct the operations.

The plaintiff's trusts have about a 2.27 percent interest in the unit. The largest owner, Exxon, has a 33 percent interest; the next largest interest is 14.5 percent. The government has conceded that the plaintiff's trusts have not actually participated in the operations of the unit.

Despite the differences in the relationship between the trusts and Quintana under this agreement and under the 1953 and 1965 operating agreements, we conclude that the trusts were not engaged in the oil business under the 1970 unit operating agreement.

In a case involving the accumulated earnings tax, *Cataphote Corp. v. United States,* 210 Ct.Cl. 125, 535 F.2d 1225 (1976), we stated:

> The line to be drawn between the ownership of a working interest which is equivalent to being in the oil and gas business and one which is akin to a mere corporate stock investment depends upon the magnitude of the interest and whether or not

the owner also has direct operating and management responsibilities.

*Id.* at 145, 535 F.2d at 1236.

The interest the plaintiff's trusts have in the unit is minor—only about 2¼ percent. That is so small that the trusts could not play any significant role in or be able to exert any influence upon the management or operation of the unit. Although the owners of the unit collectively have overall supervision and control over the unit, which Quintana operates for them, the plaintiff's trusts have played no part in that activity.

The fact, upon which the government relies, that the trusts have the right to participate in the operation of the unit is not enough to constitute active participation in the business. Viewed realistically, the trusts' interest in the unit is only an investment. Income from the operation of the trusts therefore was not "effectively connected with the conduct of a trade or business."

■ C. The Louisiana leases are subject to an operating agreement entered into in 1954 and amended in 1961. It provides that Quintana

> shall have exclusive charge, control and supervision of all operations of every kind to be conducted upon the property covered by [the] leases . . ., or any of them, for the development, production, treating and handling of oil, gas and other minerals therefrom, as well as the payment of royalties and taxes . . ., and other charges which may arise or become due.

The other provisions are practically identical to those in the Texas 1953 and 1965 agreements.

The government has asked that the trade or business issue on the Louisiana leases be remanded to the Trial Division to enable the government to obtain more information on the activities of the trusts. The very same depositions it relied on, however, to concede the issue on the first category of leases discuss these activities. These depositions and a supplementary affidavit indicate that the activities of the Louisiana trusts do not differ significantly from those

of the Texas trusts. Our decision on the Texas trusts applies equally to the Louisiana trusts. The latter trusts, like the former, did not engage in any activities related to conducting an oil and gas business.

D. In 1962, the trusts in Louisiana entered into a unit operating agreement respecting certain leases. It provides that Quintana

shall have full control of the Unit and, subject to the provisions hereof, shall conduct and manage the development and operation of the Unit for the production of oil and gas therefrom for the benefit of the parties hereto. The judgment and discretion of the Operator, exercised in good faith, shall be the limit of its liability to Non-Operators.

The trusts are not in a trade or business in connection with these leases. Their activities are of the same sort the government conceded not to be a trade or business by the Texas trusts.

E. One of the plaintiff's trusts owns two working interests that Quintana does not operate. An officer of the sole trustee stated in an affidavit that the bank's activities regarding these interests do not differ from the activities regarding all the other leases. The government has not submitted any contrary affidavits on this minor portion of the case. We hold that the trust was not engaged in a trade or business with respect to this interest.

F. The effect of our holding that none of the plaintiff's trusts is engaged in the oil and gas business is that the plaintiff's 1973 income from those trusts is subject to a flat tax of 30 percent—unless the plaintiff's 1972 renunciation of his United States citizenship had a tax avoidance purpose.

### III.

Section 877(a) of the Code provides:

Every nonresident alien individual who at any time after March 8, 1965, and within the 10-year period immediately preceding the close of the taxable year lost United States citizenship, unless such loss did not have for one of its principal purposes the avoidance of taxes,

shall be taxed on his United States source income at full graduated rates. Section 877(e) provides further that:

If the Secretary establishes that it is reasonable to believe that an individual's loss of United States citizenship would, but for this section, result in a substantial reduction for the taxable year in the taxes on his probable income for such year, the burden of proving for such taxable year that such loss of citizenship did not have for one of its principal purposes the avoidance of taxes ... shall be on such individual.

The government claims that the plaintiff did have a tax motivation for his expatriation and seeks a remand for a trial on the issue. The government has furnished evidence to show, as section 877(e) requires, that "it is reasonable to believe" that the plaintiff's expatriation in 1972 would result in lower taxes for him in 1973 but for the application of section 877. Both the plaintiff's American and Italian taxes must be considered. H.R.REP.No.1450, 89th Cong., 2d Sess. 82, *reprinted in* 1966–2 C.B. 965, 1025.

The statute requires the government to show only that "it is reasonable to believe" that section 877 would result in lower taxes. The plaintiff has not denied that a substantial reduction in taxes would occur. The plaintiff also said at oral argument, quoting in part from one of the government's briefs, that he "agree[s] with the government's final conclusion" that "it may fairly be concluded that plaintiff's total tax bill is largely governed by his United States tax rate."

The plaintiff's United States tax rate after expatriation, but for section 877, is substantially lower than it would be if he were a citizen. The government's evidence, coupled with the plaintiff's concession, satisfies the government's burden of going forward. Under section 877(e), therefore, the plaintiff now has "the burden of proving ... that such loss of citizenship did not have for one of its principal purposes the avoidance of taxes."

The plaintiff argues, however, that there are two grounds upon which the statute is inapplicable to him and that if it is applied to him, it is unconstitutional.

A. The plaintiff first contends that the tax treaty between the United States and Italy, Convention on Double Taxation, March 30, 1955, United States-Italy, 7 U.S.T. 2999, T.I.A.S. No. 3679, precludes the application of section 877 to him. Section 877 was enacted as part of the Foreign Investors Tax Act of 1966, Pub.L.No.809, § 103(f), 80 Stat. 1539, 1551–52. Section 110 of that Act provided: "No amendment made by this title shall apply in any case where its application would be contrary to any treaty obligation of the United States." *Id.* at 1575.

■ 1. The tax treaty does not prevent the application of section 877 to the plaintiff. He argues that article III(1), dealing with "industrial and commercial profits," prevents the taxation of income from only those leases respecting which the trusts are engaged in trade or business. We have held, however, that the trusts are not so engaged. *See* part II *supra.* For the other leases, the parties agree that article IX(1) of the treaty governs. It provides:

> Income from real property (not including interest derived from mortgages and bonds secured by real property) and royalties in respect of the operation of mines, quarries, or other natural resources, shall be taxable only in the contracting State in which such property, mines, quarries, or other natural resources are situated.

7 U.S.T. at 3008.

Since the plaintiff's trust income came from oil and gas wells in the United States, under the treaty it is subject to taxation by the United States. The treaty does not restrict the right of the United States to tax this income.

The plaintiff argues, however, that the tax section 877(a) imposes upon aliens who expatriated themselves with a principal purpose of avoiding taxes is a tax based on citizenship. *See* Rev.Rul. 79–152, 1979–1 C.B. 237, 238. He contends that under the treaty the United States may tax his in-come only on the basis of the source of the income (i.e., that generated in the United States), and that since he was an Italian and not a United States citizen in 1973, he cannot be taxed as a former United States citizen, as he alleges the statute attempts to do.

■ The flaw in the plaintiff's argument is that section 877 is based upon the source of the income, not the citizenship of the taxpayer. The section covers only United States source income. I.R.C. §§ 877(b), (c). Indeed, the section explicitly indicates that the tax it imposes is source-based. Section 877(c), captioned "Special rules of source," provides that two designated "items of gross income shall be treated as income from sources within the United States."

The traditional distinction between personal and source-based taxation is that personal taxation taxes worldwide income, while source-based taxation taxes only United States income. E. OWENS, FOREIGN TAX CREDIT, 520–21 (1961). In *Compagnie Financiere de Suez v. United States,* 203 Ct.Cl. 605, 492 F.2d 798 (1974), the court said that a tax on source income was a "source-jurisdiction" tax. *Id.* at 626, 492 F.2d at 810. When nonresident aliens "are taxed only on income derived from sources in the United States[, t]he jurisdictional contact ... is the source of the income." E. Owens at 520–21. As a source-based tax, section 877 is permissible under article IX(1) of the tax treaty.

■ 2. The plaintiff argues that section 877 violates the Treaty of Friendship, Commerce & Navigation, February 2, 1948, United States-Italy, art. IX, para. 1, 63 Stat. 2255, 2268–70, T.I.A.S. No. 1965, which provides that a signatory cannot tax the citizens of the other signatory differently from the way it taxes its own citizens or those of third countries. The plaintiff claims he is being taxed differently from other Italian citizens not engaged in trade or business.

Article IX(1), however, prevents discrimination only among taxpayers of different nationalities. It does not require uniform treatment of all taxpayers of a single country. Indeed, before 1966, nonresident aliens

were taxed at graduated, and hence different, rates. Foreign taxpayers, at that time, also could be taxed differently on identical investments if one of them also was engaged in an unrelated trade or business, which under the Code subjected his unrelated investment income to graduated taxes. *See* I.R.C. §§ 871(b), (c) (1964) (amended 1966).

Section 877 does not discriminate between (1) Italian citizens and (2) citizens of the United States and of third countries. It applies to all expatriates without regard to the country of which they are citizens. Article IX(1) of the friendship treaty does not preclude the application of section 877 to the plaintiff.

■ B. The plaintiff next argues that section 877(d) exempts him from section 877(a). Section 877(d) provides that section 877(a) "shall not apply to a nonresident alien individual whose loss of United States citizenship resulted from the application of section 301(b), 350, or 355 of the Immigration and Nationality Act."

The formal renunciation of citizenship the plaintiff signed states that the plaintiff "desire[d] to make a formal renunciation of my American nationality, as provided by in [sic] Section 349(a)(6) of the Immigration and Nationality Act." That form similarly stated that the Secretary of State had prescribed it "pursuant to" that section. When the plaintiff renounced his citizenship, he did so on the understanding that he was acting under section 349(a)(6).

The plaintiff contends, however, that his renunciation under section 349(a)(6) also resulted in his losing his citizenship under section 350, and that section 877(d) makes section 877(a) inapplicable to him. Section 350 provided:

A person who acquired at birth the nationality of the United States and of a foreign state and who has voluntarily sought or claimed benefits of the nationality of any foreign state shall lose his United States nationality by hereafter having a continuous residence for three years in the foreign state of which he is a national by birth at any time after attaining the age of twenty-two years.

8 U.S.C. § 1482 (1970) (repealed 1978). The plaintiff states he resided in Italy for three years after his twenty-second birthday, and argues that section 350 covers him.

The legislative history and background of section 877(d), however, show that in excepting from section 877(a) the loss of citizenship under sections 301(b), 350, or 355 of the Immigration and Nationality Act, Congress intended the exception to apply only where the loss of citizenship under those sections was involuntary. A brief description of the law on expatriation as it stood when Congress enacted section 877 is necessary to understand what Congress endeavored to do.

In *Perez v. Brownell*, 356 U.S. 44, 78 S.Ct. 568, 2 L.Ed.2d 603 (1958), the Supreme Court had upheld the constitutionality of a provision of the Nationality Act of 1940 that provided for the expatriation of American citizens who voted in a foreign political election. The Court ruled that it was immaterial whether the citizen intended to forfeit his citizenship as long as he voluntarily did the act resulting in forfeiture. 356 U.S. at 61, 78 S.Ct. at 577. "*Perez* has sustained congressional power to expatriate without regard to the intent of the citizen to surrender his citizenship." *Vance v. Terrazas*, 444 U.S. 252, 260, 100 S.Ct. 540, 545, 62 L.Ed.2d 461 (1980).

Following *Perez*, the Court in *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963), held unconstitutional another provision of the Nationality Act that provided for expatriation of American citizens who remain outside the United States in time of war to evade military service. The following year, *Schneider v. Rusk*, 377 U.S. 163, 84 S.Ct. 1187, 12 L.Ed.2d 218 (1964), invalidated as unconstitutional a statute providing that a naturalized citizen who resided in his native country for three years lost his United States citizenship. Neither of these decisions rested on the fact that the plaintiffs had not intended to forfeit their United States citizenship. The statute in *Mendoza-Martinez* was held to be penal and that in *Schneider* to be illegally discriminatory against naturalized citizens.

Congress enacted section 877 in 1966. At that time, the precise scope of congressional power to expatriate United States citizens was unclear. It appeared, however, that citizens could lose their citizenship involuntarily as a result of certain conduct.

In enacting section 877(d), Congress attempted to alleviate one of the hardships of a loss of citizenship—the higher taxes to which section 877(a) might subject the expatriated citizen. As it explained,

the new section excepts persons whose loss of citizenship occurs under circumstances where it is unlikely that tax avoidance was a principal purpose. For example, this provision does not apply where the person acquired dual citizenship at birth and loses his U.S. citizenship by residing, for a certain period, in the foreign country of which he is also a citizen by birth.

S.Rep.No.1707, 89th Cong., 2d Sess. 29, *reprinted in* 1966 U.S.Code Cong. & Ad.News 4446, 4474; H.R.Rep.No.1450, 89th Cong., 2d Sess. 23, *reprinted in* 1966–2 C.B. 965, 983. In explaining the excepted provisions of the Immigration and Nationality Act, the House report said that they provided for loss of citizenship solely by lack of residence within the United States. H.R.Rep.No.1450 at 81, *reprinted in* 1966–2 C.B. at 1024.

Section 877(a) was designed to discourage voluntary expatriation undertaken with a principal purpose of tax avoidance. Congress recognized, however, that in cases of involuntary expatriation it was "unlikely that tax avoidance was a principal purpose." In that situation, Congress excepted the expatriated citizen from the burden of having to prove that his expatriation was not tax-motivated, if the Secretary should seek to subject him to the additional burden of the higher taxes.

The committee reports reflected concern that people would lose their United States citizenship solely by lack of domestic residence, and that was the situation to which section 877(d) was addressed. Congress did not consider or discuss the effect to be given a voluntary renunciation of citizenship. We do not read the references in section 877(d) to sections 301(b), 350, and 355 of the Immigration and Nationality Act—all of which involve involuntary expatriation—as covering also voluntary expatriation. The latter form of expatriation is dealt with exclusively in section 877(a).

The plaintiff argues vigorously that he did not have a tax avoidance purpose in renouncing his United States citizenship. Congress, however, did not except that action from judicial scrutiny. If the plaintiff did not have that motive, he will have ample opportunity so to prove in the trial proceedings on the remand we are ordering.

C. The plaintiff makes two constitutional challenges to section 877(a).

1. He argues that the provision is an invalid exercise of personal jurisdiction over him. We have held, however, that section 877(a) is a source-based tax.

The plaintiff recognizes that the United States may tax United States source income at any rate. He contends, however, that Congress cannot base the rate of tax upon the identity of the taxpayer, i.e., expatriates rather than nonresident citizens, and that when it attempts to do that, it is exercising personal jurisdiction over a nonresident alien.

The plaintiff has not shown why this claim of discriminatory treatment, which we dealt with in part III(A)(2) and deal with below, converts the tax into one based on personal jurisdiction. If the plaintiff contends that Congress may never tax nonresident aliens on the basis of personal characteristics, he brings into question the distinctions between citizens and aliens and between residents and nonresidents, both personal characteristics from which the plaintiff seeks to benefit. It would be possible for Congress to tax nonresident aliens on their United States income at the same rates it taxes citizens and residents, but it has not done so.

Congress constitutionally may treat nonresident aliens as a special class and subject that class to different tax rates. In *Barclay & Co. v. Edwards,* 267 U.S. 442, 449–50, 45 S.Ct. 348, 349, 69 L.Ed. 703 (1924), the Court held that foreign corporations "constituted a class all by themselves and could be properly so treated by Congress...."

The power of Congress in levying taxes is very wide, and where a classification is made of taxpayers that is reasonable, and not merely arbitrary and capricious, the Fifth Amendment can not apply."

The plaintiff has not shown why Congress may not also draw reasonable distinctions between various classes of nonresident aliens. Section 877 taxes expatriates only on their United States source income. It is therefore a source-based tax. The plaintiff's complaints about distinctions drawn between expatriates and aliens who were never citizens of this country are judged by the traditional due process and equal protection standards and are dealt with below.

2. The plaintiff argues that section 877(a) denies him due process because "the means are unnecessary [and] inappropriate to the proposed end, are unreasonably harsh or oppressive, when viewed in the light of the expected benefit, . . . [and] the guarantee of due process is infringed." *Helvering v. City Bank Farmers Trust Co.,* 296 U.S. 85, 90, 56 S.Ct. 70, 73, 80 L.Ed. 62 (1935).

■ Congress has wide discretion in deciding whom to tax and how much. *Id.; Barclay,* 267 U.S. at 450, 45 S.Ct. at 349. This court has said the test is one of minimum rationality. *First National Bank v. United States,* 215 Ct.Cl. 609, 613–15, 571 F.2d 21, 23–24, *cert. denied,* 439 U.S. 827, 99 S.Ct. 100, 58 L.Ed.2d 120 (1978). There is a strong policy against invalidating tax statutes, and any rational basis for a taxing statute will justify it. *Id.,* 571 F.2d at 23–24.

■ The plaintiff contends section 877 is ill-suited to preventing tax avoidance because it does not cover all instances. Such arguments, however, are better addressed to Congress. Section 877 was not designed to prevent all tax avoidance. It "was enacted to forestall tax-motivated expatriation." *Kronenberg v. Commissioner,* 64 T.C. 428, 434 (1975); *accord,* S.Rep.No.1707 at 28–29, *reprinted in* 1966 U.S.Code Cong. & Ad.News at 4473–74, H.R.Rep.No.1450 at 22–23, 79, *reprinted in* 1966–2 C.B. at 982–83, 1023.

The possibility that Congress might draft a better or a more comprehensive statute is not a reason for invalidating the present one. Congress certainly had a reasonable basis for concluding that United States citizens who expatriate themselves with a principal purpose of avoiding taxes should not be given the favorable tax treatment that nonresident aliens generally receive.

## CONCLUSION

The plaintiff's motion for summary judgment is granted with respect to the trade or business issue, and is denied with respect to the tax avoidance purpose issue. The defendant's motion for summary judgment on the trade or business issue is denied. The case is remanded to the Trial Division to determine whether a principal purpose of the plaintiff's renunciation of his United States citizenship was the avoidance of taxes and, if necessary, to determine the first offset issue. (As noted, the plaintiff has conceded the second offset issue since he has prevailed on the trade or business issue.) On remand, the Trial Division shall determine also the net profits interest issue, if it is in the case.