SANTIAGO PEREZ, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Perez v. Commissioner
Docket Nos. 39954-84; 28957-85.
United States Tax Court
T.C. Memo 1988-464; 1988 Tax Ct. Memo LEXIS 499; 56 T.C.M. (CCH) 312; T.C.M. (RIA) 88464; September 26, 1988. Richard H. Bergman, for the petitioner. Sergio Garcia-Pages, for the respondent. GERBER
MEMORANDUM FINDINGS OF FACT AND OPINION GERBER, Judge: Respondent, in a statutory notice of deficiency dated July 9, 1984, [1] determined deficiencies and additions to tax for the taxable years 1983 and 1984, [2] respectively, as follows: Additions to Tax
Year
Tax
6651(a)(1) [3]
6653(a)(1)
6653(a)(2)
6654
1983
$ 327,413.95
$ 32,741.40
$ 16,370.70
*
$ 20,057.37
1984
132,302.00
13,230.00
6,615.00 **
7,642.00
*501 The issues presented for our consideration are: (1) Whether petitioner, a national of Columbia, earned commission income of $ 671,881.90 during 1983 and $ 289,733.00 from January 1, 1984 to April 10, 1984, by illegal money-laundering services performed in South Florida; and (2) whether petitioner is liable for additions to tax for taxable years 1983 and 1984 under sections 6651(a)(1), 6653(a)(1), 6653(a)(2) and 6654. FINDINGS OF FACT The stipulation of facts [4] and attached exhibits is incorporated herein by this reference. Petitioner's legal residence and principal office were located at Bogota, Columbia, at the time the petitions herein were filed. The Circuit Court of Appeals for the Eleventh Circuit has been designated, by agreement of the parties, as the venue for purposes of an appeal, if any, from the decision of this Court. Sec. 7482(b)(2). Petitioner did not file Federal income tax returns for taxable years 1983 and 1984. Petitioner, together with his Panamanian corporation, Santa Mundial, S.A., maintained five checking accounts at the Flagship Bank of Miami *502 Beach (Flagship Bank), located at 1111 Lincoln Road, Miami Beach, Florida. Deposits made to these accounts during petitioner's 1983 taxable year and 1984 taxable period (net of interaccount transfers) totaled $ 13,517.638.04 and $ 4,771,662.00, respectively. The deposits to the accounts were as follows: Deposits
Account Number
1983
1984
360-219-568-1
$    717,149.83
$   394,900.00
360-220-770-4
-0-     126,639.03
360-813-102-8
9,700.00
-0-     360-805-662-4
1,483,303.00
248.56
360-198-386-5
11,307,485.21
4,249,874.41
Total Deposits
$ 13,517,638.04
$ 4,771,662.00
Respondent treated petitioner as an illegal-money launderer, who charged a commission for his services to drug dealers in South Florida. In the statutory notice of deficiency, respondent determined that petitioner earned a 5-percent commission on the funds deposited to these accounts. Petitioner's money-laundering scheme involved Gustavo Restrepo (Restrepo), Jose R. Botero (Botero), and Gilberto Ramirez (Ramirez) and other unidentified individuals. Restrepo's commission for his services was 2 percent of the gross amount of cash he received. This *503 rate corresponds to the rate charged by other similarly situated money-launderers. Petitioner's position in the scheme was higher than that of Restrepo, therefore his commission rate was higher than 2 percent. Similar activities to those engaged in by petitioner generated commissions ranging from 6 to 9 percent. To account for expenses petitioner may have incurred as a result of his involvement, a 5-percent commission is used. Respondent became aware of petitioner's activities as the result of an investigation into the purchase of large numbers of bank checks in amounts less than $ 10,000 by certain individuals. Banks are required to file Currency Transaction Reports with the Federal Government of transactions involving $ 10,000 or more. The purchase of bank checks in amounts less than $ 10,000 in a deliberate attempt to frustrate the reporting requirements of currency deposits constitutes a violation of this law. 30 U.S.C. sec. 5313 (1982) (Bank Secrecy Law). In August 1983, special agents of the Internal Revenue Service [5] received a tip from an officer of *504 a bank in Palm Beach County, Florida, to the effect that two individuals, later identified as Botero and Ramirez, were buying, on a regular basis, bank checks (cashier's checks or money orders) in amounts less than $ 10,000 per check. *505 The "Operation Greenback" investigation which revealed petitioner's activities was headed by Special Agent Michael E. Wenneman (Wenneman). Wenneman has been employed by the Criminal Investigation Division of the Internal Revenue Service since 1974. He has been assigned to "Operation Greenback" since its inception in 1980. After "Operation Greenback" received the tip, Botero and Ramirez were placed under surveillance. This surveillance revealed that Botero and Ramirez made frequent visits to a particular apartment located at 1901 Brickell Avenue, Miami, Florida. On many occasions Botero and Ramirez were observed arriving at this building carrying only a white envelope or nothing in their hands, and on most occasions leaving the building with a brown bag. Upon leaving the apartment Botero and Ramirez would drive to Flagship Bank or one of the other banks they frequented in Broward and Palm Beach Counties. Upon reaching the bank, Botero and Ramirez would purchase numerous bank checks each in an amount less than $ 10,000. The checks, purchased in fictitious remitter and payee names, were later endorsed to make them fully negotiable. This cycle was repeated regularly during the *506 investigation which lasted from August 1983 through April 9, 1984. On different occasions during the investigation, the money Botero and Ramirez received from Restrepo to purchase bank checks was set aside by the bank officers pursuant to instructions from the agents of "Operation Greenback." This money was tested by the agents of "Operation Greenback" for traces of narcotics. Each test read positive for live traces of cocaine or marijuana. These results were an indication that the money had been in close proximity to cocaine or marijuana within 30 days prior to testing and had not entered the main stream of currency circulation after its association with the narcotics. Botero and Ramirez were referred to as "smurfs" in this role. "Smurfs" is the term used to describe those participants of a money-laundering operation who go from bank to bank buying numerous bank checks each for an amount less than $ 10,000 on a daily basis in order to illegally avoid filing Currency Transaction Reports as required by Federal law. Factors which affect the commission charged include the risk of detection, complexity of handling the funds depending on the money-laundering technique opted, particular *507 demands made by the client, and prior dealings. Restrepo paid his "smurfs" a commission of 1/4 percent to 3/4 of a percent of the total funds they converted into bank checks. On certain occasions, Restrepo and Botero were observed by the agents of "Operation Greenback" leaving Restrepo's apartment and driving to the Flagship Bank where they proceeded to the international department and deposited bank checks into petitioner's accounts. The bank officers of Flagship Bank had received instructions from petitioner to accept deposits for his accounts from Restrepo. On April 9, 1984, upon the culmination of the investigation, Botero was observed driving to Restrepo's apartment building at 1901 Brickell Avenue. Upon arrival, Botero parked his car outside the building, took a white envelope from the visor of the car and proceeded to enter Restrepo's apartment. Approximately 3 hours later Botero returned to the car carrying a brown bag which appeared heavy on one end. He was not carrying the brown bag when he entered the building. After reentering his car, Botero spent approximately 1 minute bent over the front seat. He then left the building and drove south on Brickell Avenue. *508 Pursuant to an arrest warrant, Wenneman and other agents involved in the investigation stopped Botero a few blocks away from the entrance of Interstate-95 North. The next day a search warrant was obtained and Botero's car was searched. Pursuant to such search, $ 10,000 in cash, among other things, was found under the front seat. This cash tested positive for live traces of narcotics. Among the other items found in the search were: (1) Notepapers adding up small amounts of money similar to the amounts used on prior occasions to purchase bank checks; (2) "tissue copies" of bank checks, (3) Federal Express mail bags; and (4) maps of Palm Beach and Broward Counties with highlighted separated routes to local banks. The routes to the banks were highlighted so as to enable Botero and Ramirez to visit them proportionally and purchase bank checks in amounts less than $ 10,000 without raising suspicion. A search warrant was obtained for Restrepo's apartment and a search was conducted concurrently with the search of Botero's car. During the search, Restrepo, his wife and minor child were present. The following items were found in the apartment as a result of the search: (1) $ 200,000 *509 in cash which tested positive for live traces of narcotics; (2) 212 cashier's checks and money orders, each for an amount less than $ 10,000, with a total face value of approximately $ 530,000; (3) deposit slips for various bank accounts; (4) deposit slips for the account of petitioner's corporation, number 360-220-770-4, dated April 4, 1984, which showed checks totaling $ 40,000; (5) ledger sheets which set forth the cash received and gross commissions and expenses paid; (6) calculator; (7) "tacky finger" to count money; (8) counterfeit currency detector; (9) paper shredder; (10) rubber banks, paper clips and business envelopes; and (11) beepers or telephone pagers. The ledger sheets found during the search were for the period March 2, 1984 through April 7, 1984. They were identified as typical records of an illegal money-laundering operation. It is common practice to keep summary-type financial records of illegal money-laundering operations for a short period of time. The records are usually destroyed upon confirmation of the (illegal) transactions occurring between the co-conspirators to the scheme. The telephone pagers found during the search continued to sound for incoming *510 calls even after Restrepo's arrest. Agents of "Operation Greenback" answered some of the incoming calls, one of which informed them that a certain individual has "20 tickets" for delivery to Restrepo. A large shopping mall was agreed upon as the meeting place and one of the agents met an individual there at the agreed spot. The agent walked with this individual to a parked car where another individual was sitting. The agent was given a bag containing the "20 tickets." Upon checking the contents of the bag, the "20 tickets" turned out to be $ 20,000 in cash. This cash tested positive for live traces of narcotics. Based on the deposit slip found in Restrepo's apartment which reflected a deposit in the amount of $ 40,000 being made to account number 360-220-770-4, the agents of "Operation Greenback" summoned all records relating to this account from Flagship Bank. These records revealed that petitioner held signatory power over this account. The agents then summoned the records for all other accounts at Flagship Bank over which petitioner had signatory power. This effort located four additional accounts. Net deposits totaling $ 18,289,300.04 were made to these accounts during *511 petitioner's 1983 taxable year and 1984 taxable period. Except for the wire-transferred deposits, the deposits to petitioner's accounts at Flagship Ban consisted of bank checks each in an amount less than $ 10,000. These checks had been purchased generally within 2 or 3 days before being deposited. Of the total net deposits of $ 13,517,638.04 for 1983 and $ 4,771,662.00 for 1984, $ 3,654,955.17 in 1983 and $ 775,000.00 in 1984 were deposits made via wire transfers. The bank records reflecting the deposits to petitioner's accounts in the form of wire-transferred funds reflect that the funds were not sent from financial institutions abroad. The link from Restrepo's money-laundering activity to petitioner was made through the records seized during the search of Restrepo's apartment. According to these records, during the period March 2, 1984 through April 7, 1984, the following funds were distributed to petitioner in the form of bank checks: DATE
AMOUNT
March 6, 1984
$   120,000
March 8, 1984
200,985
March 9, 1984
199,015
March 12, 1984
200,000
March 14, 1984
203,000
March 15, 1984
200,004
March 20, 1984 [6]
100,000
$ 1,223,004
*512 Each of the first six distributions were traced directly into petitioner's account number 360-198-386-5 and each deposit consisted of numerous bank checks each in an amount less than $ 10,000. During the period March 7, 1983 through March 15, 1984, bank checks totaling $ 15,557,360 were deposited to petitioner's account number 360-198-386-5. OPINION We first consider whether petitioner earned commission income of $ 671,881.90 during 1983 and $ 289,773.00 during January 1, 1984 to April 10, 1984, from illegal money-laundering services performed in South Florida. Petitioner, a national of Columbia, argues that he is a nonresident alien, therefore he is not subject to the incidence of taxation in the United States. Even as a nonresident alien, petitioner is subject to the incidence of United States taxation if we find that he engaged in a trade or business within the United States. [7]Section 871(b); see Di Portanova v. United States,690 F.2d 169 (Ct.Cl. 1982). *513 Respondent argues that petitioner was engaged in the business of illegal money-laundering in South Florida and is subject to the incidence of United States tax as set forth in the notices of deficiency. Respondent's determination is presumed correct and petitioner bears the burden of proving otherwise. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a). Petitioner seeks to carry his burden of proof by asserting that respondent's notice of deficiency is arbitrary and capricious. Petitioner, by arguing that the notice of deficiency is arbitrary, is, in essence, asking this Court to look behind the notice of deficiency. As a general rule, we will not look behind the notice of deficiency to examine the evidence used or the propriety of respondent's motives or administrative policy or procedure in making the determination. Greenberg's Express, Inc. v. Commissioner,62 T.C. 324, 327 (1974). Suarez v. Commissioner,58 T.C. 792, 813 (1972). Respondent's *514 determination may often rest upon hearsay or other inadmissible evidence. The circumstances of this case do not require a review of the materials that were before respondent in order to ascertain whether he relied upon improper evidence. Rosano v. Commissioner,46 T.C. 681, 687 (1966). The rationale for this rule is that a trial before the Tax Court is a proceeding de novo; our determination of a petitioner's tax liability must be based on the merits of the case and not any previous record developed at the administrative level. Greenberg's Express, Inc. v. Commissioner,62 T.C. at 328. On rare occasions, this Court has recognized a possible exception to this rule and has looked behind the notice of deficiency. Cases involving unreported illegal income come within this exception only where respondent, resting solely on the presumption of correctness, introduced no substantive evidence to support his determination. See Weimerskirch v. Commissioner,67 T.C. 672 (1977), revd. 596 F.2d 358 (9th Cir. 1979); Human Engineering Institute v. Commissioner,61 T.C. 61, 66 (1973). *515 This case does not fit within this exception; respondent has presented evidence supporting a finding of unreported income and the source thereof by petitioner during the taxable periods in issue. Respondent first became aware of petitioner's involvement in an illegal activity during the search of Restrepo's apartment in which a deposit slip was found reflecting a deposit made to the account of petitioner's corporation. Upon further inquiry by the agents of "Operation Greenback," four more accounts were located at Flagship Bank to which substantial amounts of money had been deposited. The bank records pertaining to these accounts reflected that a large percentage of these deposits consisted of bank checks in amounts less than $ 10,000. Moreover, on a number of occasions, the agents of "Operation Greenback" observed Restrepo making deposits to various accounts in Flagship Bank over which petitioner had signatory power. Further inquiry into this activity revealed that the officers at Flagship Bank were instructed to accept deposits to these accounts from Restrepo. Petitioner has failed to present any evidence that shows that Restrepo had joint signatory power over any of the accounts *516 to make the funds available to petitioner through making deposits to these accounts. Petitioner has not disputed that he held these accounts at Flagship Bank, nor does he dispute that large sums of money were deposited to these accounts by Restrepo. Rather, petitioner argues that respondent cannot make a connection between Restrepo's illegal activities and petitioner. We find otherwise. Petitioner and his corporation maintained five checking accounts between them at Flagship Bank. Deposits, totaling (net of interaccount transfers) $ 13,517,638.04 and $ 4,771,662.00 were made to these accounts during petitioner's 1983 taxable year and 1984 taxable period, respectively. An officer from Flagship Bank notified the agents of "Operation Greenback" that two individuals, later identified as Botero and Ramirez, were buying, on a regular basis, bank checks in amounts less than $ 10,000. Upon surveillance of the activities of Botero and Ramirez, the agents of "Operation Greenback" learned that Botero and Ramirez, who acted as "smurfs" for Restrepo, made frequent visits to Restrepo's apartment. Botero and Ramirez usually arrived at the apartment carrying only a white envelope or nothing *517 in their hands, and on most occasions left the building carrying a brown bag. Upon leaving the apartment, Botero and Ramirez would drive to Flagship Bank or one of the other local banks they frequented. Once at the bank, Botero and Ramirez would purchase numerous bank checks in amounts of less than $ 10,000. The bank checks were purchased in fictitious remitter and payee names. The checks were subsequently endorsed to make them fully negotiable. Maps showing the banks in the surrounding area with the routes to them highlighted were found during the search of Restrepo's apartment. This information was important to "smurfs" such as Botero and Ramirez, who needed to purchase large quantities of bank checks, each in an amount less than $ 10,000, without arousing any suspicion. On many occasions the agents of "Operation Greenback" observed Restrepo and Botero leaving Restrepo's apartment building and driving to Flagship Bank where they proceeded to the international department. Through cooperation from the bank officers, the agents of "Operation Greenback" learned that on such visits, Restrepo made deposits to petitioner's accounts. The bank officers had received instructions from *518 petitioner to accept from Restrepo deposits to his accounts including the account for his corporation. An examination of the bank records revealed that Restrepo deposited large sums of money to these accounts which consisted in large part of bank checks each for an amount less than $ 10,000. These checks were usually purchased within 2 to 3 days of being deposited. Respondent has established that petitioner, through his accounts at Flagship Bank, received large sums of money from Restrepo. Also, respondent has shown that cash deposited to petitioner's accounts was, on occasion, set aside and tested for narcotics. In all instances the cash tested positive for live traces of cocaine or marijuana. This meant that the cash had been in close proximity to cocaine or marijuana within 30 days of testing and had not entered the main stream of currency circulation after its association with the narcotics. Moreover, respondent has shown that Restrepo's "smurfs," Botero and Ramirez, busily engaged in purchasing bank checks in amounts less than $ 10,000. These checks were later used to make substantial deposits to petitioner's accounts. The checks were purchased with the specific intent *519 of frustrating the Currency Transactions Reports requirement. Respondent has clearly shown that petitioner engaged in activities involving narcotics and that a substantial amount of money generated by these activities ended up within petitioner's control. Petitioner neither appeared as a witness nor offered any evidence contradicting respondent's determination. Petitioner himself was the one person who could throw the most light on his involvement in these activities. Yet, he deliberately refused to appear at trial and take the witness stand and expose himself to cross-examination. Petitioner has failed to present evidence to disprove the connection respondent has shown between petitioner and Restrepo's illegal activities, and has failed to present any evidence to show why it was necessary to conceal the source of the money deposited to his accounts by channeling the funds through an intermediary Restrepo. We note that respondent did not assert that petitioner was a drug dealer despite the fact that large sums of money traced to narcotics involvement were deposited to petitioner's accounts and remained in his control. Rather, respondent made a more conservative determination *520 that petitioner laundered money from the sale of narcotics in the United States. Respondent argues that petitioner's activities conducted in South Florida constitute a trade or business for purposes of triggering the incidence of United States taxation. Petitioner contends that he was not engaged in a trace or business within the United States, therefore he is not subject to the incidence of United States taxation. We agree with respondent.
A foreign taxpayer is engaged in a trade or business within the United States if the taxpayer, continuously and regularly, transacts a substantial portion of its ordinary business within the United States during a substantial portion of the taxable year. Commissioner v. Spermacet Whaling & Shipping Co.,281 F.2d 646 (6th Cir. 1960). The term "engaged in a trade or business" has been interpreted to mean "doing business" which conveys the idea of a continued and sustained activity. Consolidated Premium Iron Ores Ltd. v. Commissioner,28 T.C. 127 (1957). We find that petitioner's activities conducted in South Florida *521 meet this standard. The surveillance conducted by "Operation Greenback" which revealed petitioner's involvement in the money-laundering activities lasted for a continuous 8-month period. During this time, Restrepo, Botero and Ramirez were observed engaging in activities that were later tied to petitioner. Petitioner's involvement continued on a regular basis before the surveillance was put into effect, and for 8 months thereafter. Petitioner has presented no evidence to show that the activities were not continuous and substantial, or to provide another explanation for the deposits to his account. We find, therefore, that petitioner was engaged in business in South Florida and is subject to the incidence of United States taxation. We thus find that petitioner was engaged in illegal money-laundering in South Florida from which he earned commission income of $ 671,881.90 during 1980 and $ 289,733.00 during January 1, 1984 to April 10, 1984. Next we must determine whether petitioner is liable for additions to tax for taxable year 1983 and taxable period 1984 under sections 6651(a)(1), 6653(a)(1), 6653(a)(2) and 6654. Petitioner bears the burden of proving that he is not liable *522 for these additions to tax. Bixby v. Commissioner,58 T.C. 757, 791 (1972); Enoch v. Commissioner,57 T.C. 781, 802 (1972). Section 6651(a)(1) provides for an addition to tax in the amount of 5 percent of the tax required to be shown on the return for each month (or part thereof) during which the failure to file the return continues, but not to exceed 25 percent in the aggregate. The addition can be avoided if the taxpayer establishes that the failure to timely file was due to reasonable cause and not due to willful neglect. Whether reasonable cause existed for petitioner's failure to meet the due date for the return in question is a matter of fact to be determined from all the surrounding facts and circumstances. Fleming v. United States,648 F.2d 1122, 1124 (7th Cir. 1981); Ferrando v. United States,245 F.2d 582, 587 (9th Cir. 1957). A taxpayer has reasonable cause for delay of filing his tax return if he exercises ordinary business care and prudence and nevertheless is unable to meet the due date. Sec. 301-6651-1(c)(1), *523 Proced. & Admin. Regs. In the present case petitioner failed to file returns for both his 1983 and 1984 taxable years. Petitioner argued that he was a national and resident of Columbia, therefore, he was not subject to the incidence of United States taxation. We note, however, that petitioner was actively involved with "laundering" large sums of money in the United States. Petitioner knew or should have known that such activities were conducted on a continuous and substantial level, thus exposing him to the incidence of United States taxation. Petitioner's failure to make the necessary inquiries to clarify this does not absolve him from liability pursuant to this section. Consequently, we find that petitioner is liable for the addition to tax pursuant to section 6651(a)(1).
Section 6653(a)(1) provides for an addition to tax in the amount of 5 percent of any underpayment if any part of the underpayment "is due to negligence or intentional disregard of rules or regulations * * *." Section 6653(a)(2) provides for a further addition in the amount of 50 percent of the interest upon those *524 portions of the underpayment which are attributable to a taxpayer's negligence or intentional disregard of the rules and regulations. Petitioner has the burden of proving that his underpayment of taxes was not the result of his negligence or intentional disregard of these rules and regulations. Courtney v. Commissioner,28 T.C. 658, 669-670 (1957). Negligence, within the meaning of section 6653(a), is the lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances. Neely v. Commissioner,85 T.C. 934, 947 (1985). Petitioner did not testify at trial and has not overcome the presumption of correctness attached to respondent's determination with respect to the section 6653(a)(1) and (2) additions to tax. Petitioner made no effort to file tax returns for the taxable years involved herein. Rather, petitioner seeks to avoid the imposition of these additions to tax by arguing that he was not a citizen or resident of the United States, therefore he is not subject to the incidence of United States taxation. *525 Despite petitioner's continuous involvement in illegal activities in South Florida he made no effort to ascertain his status with respect to the requirement of filing United States tax returns. Such conduct on petitioner's part supports a finding of negligence and intentional disregard of these rules and regulations. We hold that petitioner is liable for an addition to tax pursuant to section 6653(a) for his 1983 and 1984 taxable years. Section 6654 provides, subject to limited exceptions not pertinent here, for an addition to tax for failure to pay estimated taxes. The provisions are mandatory and apply where income tax and has failed to do so. See Grosshandler v. Commissioner,75 T.C. 1, 20-21 (1980); Estate of Ruben v. Commissioner,33 T.C. 1071 (1960). Petitioner failed to file tax returns for the years involved herein. Respondent has determined deficiencies against petitioner which we have sustained. Petitioner did not make any estimated payments, and respondent's section 6654(a) addition to tax determination is sustained. To reflect the *526 foregoing, Decision will be entered for the respondent.
Footnotes
1. The deficiencies and additions to the tax for the taxable years in issue were assessed by respondent on May 10, 1984, pursuant to the provisions of sections 6851 (Termination Assessments of Income Tax) and 6861 (Jeopardy Assessments of Income, Estate, Gift and Certain Excise Taxes). ↩
2. The deficiency for the 1984 taxable year relates to the short taxable year for the period Jan. 1, 1984 to Apr. 10, 1984. Respondent terminated petitioner's 1984 taxable year on Apr. 10, 1984. ↩
3. Unless otherwise indicated, all section references are to the Internal Revenue Code as amended and in effect during the taxable years in issue. All rule references are to the Tax Court Rules of Practice and Procedure. * 50 percent of the interest due on $ 327,413.95. ** 50 percent of the interest due on $ 132,302.↩
4. A stipulation of facts and two supplemental stipulations of fact were received into evidence. ↩
5. The special agents were assigned to a specialized group of Government agents formed to investigate money laundering generated from drug trafficking. The project was named "Operation Greenback." "Operation Greenback" is a joint task investigative effort which draws upon the resources of the U.S. Department of Justice; the United States Attorney's Office, Miami, Florida; the Internal Revenue Service; the Drug Enforcement Administration; the U.S. Customs Service; the Immigration and Naturalization Service; and the Organized Crime Unit of the Dade County Police Department. The primary goal of "Operation Greenback" is the prosecution of crimes arising from narcotics trafficking which also violate the currency laws of the United States, such as transactions carried out in a way to cause financial institutions to fail to file Currency Transaction Reports. "Operation Greenback" investigates the financing of narcotics trafficking and the "laundering" of money received from the importation and sale of illegal drugs in the United States. ↩
6. This deposit was not traced into petitioner's account because the bank records covering this date were not available when the records relating to the account were summoned by respondent. ↩
7. We make no determination whether, based on the "substantial presence" test under sec. 7701(b)(3), petitioner is a resident alien for purposes of United States taxation. ↩