FRANCES COKES, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 7435-84.           Filed August 15, 1988.

*Willard C. Shrode,* for the petitioner.
*Deborah M. Gehring,* for the respondent.

CHABOT, *Judge:* Respondent determined deficiencies in Federal individual income taxes against petitioner as follows:

| Year | Deficiency[1] |
| --- | --- |
| 1980 | $2,151.51 |
| 1981 | 2,762.10 |
| 1982 | 3,029.40 |

---

[1]Of these amounts, $53.61 of the 1980 total is a deficiency in ch. 1 income tax; the remaining amounts for all 3 years are ch. 2 self-employment taxes.

Unless indicated otherwise, all chapters, subchapters, and section references are to chapters, subchapters, and sections of the Internal Revenue Code of 1954 as in effect for the years in issue.

Because petitioner conceded in her petition the item causing the chapter 1 portion of the deficiency for 1980, the issue for decision is whether petitioner's income from an oil and gas working interest in 1980, 1981, and 1982, is subject to the self-employment taxes provided by section 1401..

## FINDINGS OF FACT

Some of the facts have been stipulated; the stipulation and the stipulated exhibits are incorporated herein by this reference.

When the petition was filed in the instant case, petitioner resided in Evansville, Indiana.

Sometime before 1970, petitioner's husband, Hubert Cokes (hereinafter sometimes referred to as Cokes) acquired an interest in seven leases to extract oil from certain real property in Posey County, Indiana.

Generally, and in the instant case, a working interest in an oil field is a leasehold interest granted by the fee simple owner of the land to explore for and extract oil from the land. A unitization agreement combines owners of working interests of separate leases into one unit so that an oil field may be operated as a single unit.

A royalty interest is an interest in the underlying oil and gas reserves which is retained when the owner of land grants to another the right to ascertain whether a commercial quantity of oil and gas exists and, if so, to develop the property and produce the mineral. A royalty interest bears no portion of the cost of exploration, development, and production.

The owners of a working interest in a unit select someone to operate the unit for them. The unit operating agreement names the operator and states the terms, provisions, and conditions for the operation.

On May 1, 1970, petitioner and Cokes entered into a unitization agreement and a unit operating agreement for the operation of an oil field known as Rogers Unit, Posey County, Indiana. Cokes' interest in the seven Posey County leases became the entire Rogers Unit.[2] The reason petitioner

[2]The parties stipulated that Cokes' interest in the seven leases "became part of the Rogers Unit." However, both sides have proposed findings of fact that these seven leases became "the entire Rogers Unit." The testimony is consistent with the proposed findings of fact. We

and Cokes entered into the agreements was to drill for and recover oil from the Rogers Unit. By the terms of these agreements, Cokes received a 42.29-percent working interest in the Rogers Unit. These agreements also named T.W. George (hereinafter sometimes referred to as George) as unit operator of the Rogers Unit.

Some of the salient terms and provisions of the unit operating agreement are as follows:

Under article III, the working interest owners are to pass upon and decide, among other matters, the method of operations, drilling of wells, well recompletion expenditures, dispositions of materials and equipment, court appearances, audits, inventories, technical services, investments, and termination of the unitization agreement.

Under article VII, generally the unit operator has the exclusive right and is obligated to develop and operate the unit area for the production of unitized substances (in the instant case, oil or gas).

Under article IV, any working interest owners with a five-percent or more combined interest can call a meeting of all owners.

Also under article IV, in general, decisions are to be made by the vote of at least 51 percent of the total voting interest. However, if any two voting interest owners own more than 51 percent voting interest, then their vote must be supported by the vote of two or more working interest owners.

Under article VI, the unit operator may be removed by a vote of 75 percent of the combined voting interest remaining after excluding the unit operator's interest.

Under article V, each working interest owner has the right to access to the unit area and to all reports and data pertaining to the unit operations.

Under article XI, each working interest owner is to reimburse the unit operator for that owner's proportional share of the costs and expenses incurred in developing and operating the unit area.

## Article XVI provides, in pertinent part, as follows:

16.1 INDIVIDUAL LIABILITY. The duties, obligations and liabilities of Working Interest Owners shall be several and not joint or collective; and nothing herein contained shall ever be construed as creating a partnership of any kind, joint venture or an association or trust between or among Working Interest Owners.

## Article XVII provides as follows:

17.1 INTERNAL REVENUE PROVISION. Each Working Interest Owner hereby elects that it and the operations covered by this

---

treat the parties' proposed findings as, in effect, a modification of their stipulation. See Rule 91(e), Tax Court Rules of Practice and Procedure.

Agreement be excluded from the application of Subchapter K of Chapter I of Subtitle A of the Internal Revenue Code of 1954, or such portion or portions thereof as the Secretary of the Treasury of the United States or his delegate shall permit by election to be excluded therefrom. Unit Operator is hereby authorized and directed to execute on behalf of each Working Interest Owner such additional or further evidence of said election as may be required by regulations issued under Subchapter K or should said regulations require each party to execute such further evidence, each Working Interest Owner agrees to execute or join in the execution thereof.

The unitization agreement provides that it may be terminated by working interest owners owning 75 percent of the total voting interest. The unitization agreement further provides that unitized substance is to be delivered to the working interest owners in kind. The unitization agreement also provides that if a working interest owner fails to take delivery or dispose of the unitized substance when produced, the unit operator may dispose of the production on the account of, and at the expense of, the owner, and pay the owner the net proceeds.

A stated purpose of the unitization agreement, and by reference, the unit operating agreement, is to "increase the ultimate recovery of oil, gas and associated minerals from the Rogers Unit."

The working interest owners of the Rogers Unit received checks for the sale of oil directly from the purchaser of the oil.

George died in 1972, and all his interests in oil wells were placed in the T.W. George Trust (hereinafter sometimes referred to as the trust), which continued to operate the Rogers Unit under the terms of the unitization and unit operating agreements.

In particular, the trust continued to operate the Rogers Unit in 1980, 1981, and 1982.

Cokes died on February 13, 1978, and, as a consequence, petitioner became the sole owner of 0.422900 of the total working interest in the Rogers Unit. During 1980, 1981, and 1982, the working interest owners in the Rogers Unit were as shown in table 1.

Table 1

| Name | Working interest[3] |
|------|---------------------|
| Petitioner .......................................... | 0.422900 |
| H.S. Barger ....................................... | 0.125 |
| Amalie Barger..................................... | 0.022923 |
| Glantz ............................................ | 0.0625 |
| The Trust ......................................... | 0.241677 |
| R.W. Kuzmich .................................... | 0.125 |

H.S. Barger is an independent petroleum engineer who is a majority owner and chief executive officer of Barger Engineering, Inc., Petroleum Consultants (hereinafter sometimes referred to as Engineering). H.S. Barger had overseen production of about 100 of George's and the trust's wells, beginning about 1950. For the years 1980, 1981, and 1982, the trust paid Engineering for services rendered in connection with the Rogers Unit and about 20 other projects, and Engineering received gross revenues (including revenues from the trust), in the amounts shown in table 2.

Table 2

| Year | Amounts paid to Engineering by the trust | Engineering's gross revenues |
|------|-------------------------------------------|-------------------------------|
| 1980 | $34,479.28 | $648,350.75 |
| 1981 | 38,486.22 | 456,993.98 |
| 1982 | 41,118.18 | 422,060.74 |

Amalie Barger is the wife of H.S. Barger and is employed by Engineering as a receptionist.

For 1980, 1981, and 1982, H.S. Barger and Amalie Barger each paid self-employment taxes on income received from the Rogers Unit.

---

[3]The record is sparse, and to some extent contradictory, as to how the working interest owners obtained their interests. It appears that Cokes transferred working interests to George, H.S. Barger, Topsy Jean Glantz (hereinafter sometimes referred to as Glantz) and R.W. Kuzmich on Feb. 5, 1969, as a result of which the working interests were owned as follows:

| | |
|------|------|
| Cokes ......................................................... | 0.46875 |
| H.S. Barger ...................................................... | 0.125 |
| Glantz ......................................................... | 0.0625 |
| George.......................................................... | 0.21875 |
| R.W. Kuzmich.................................................... | 0.125 |

The parties have stipulated, inconsistently with the foregoing, that H.S. Barger and R.W. Kuzmich each bought his working interest from George; petitioner testified consistently with the latter stipulation. She also testified that Glantz obtained her interest from George. The record does not indicate how Coke's interest (inherited by petitioner) came to be reduced to 0.42290, how George's interest (transferred to the trust) came to be increased to 0.241677, and how Amalie Barger came to acquire her 0.022923 interest. Glantz was George's daughter.

R.W. Kuzmich, an independent drilling operator, leased a drilling rig to the Rogers Unit. R.W. Kuzmich worked as a geologist for George from 1951 through 1954. Later R.W. Kuzmich became an independent oil operator and participated with George in various oil ventures. R.W. Kuzmich lived and worked in Midland, Texas, and had no contact with the Trust concerning the Rogers Unit, other than paying his portion of the expenses and receiving reports. For 1980, 1981, and 1982, R.W. Kuzmich reported income from the Rogers Unit on Schedule C of his Form 1040.

Working interest owners of the Rogers Unit paid in proportion to their interests all costs and expenses incurred in the development and operation of the unit area. Each month petitioner received a bill for her share of expenses and wrote a check to the operator for those expenses. Coke's 42.29-percent share of the expenses so billed and paid for the years in issue aggregated the amounts shown in table 3.

Table 3

| Year | Amount |
|------|--------|
| 1980 | $32,459.06 |
| 1981 | 38,090.31 |
| 1982 | 37,307.27 |

Petitioner reported income from the Rogers Unit for 1979 on her individual income tax return on Schedule C and on Schedule SE. Petitioner paid self-employment tax on her 1979 Rogers Unit income. Cokes paid self-employment tax on income from the Rogers Unit for 1970 through 1978.

Petitioner did not receive social security payments for 1979. Petitioner started drawing social security benefits as Cokes' surviving spouse in 1980, and drew benefits for 1980, 1981, and 1982. Petitioner received income from the Rogers Unit for the taxable years, which income represented a percentage of her adjusted gross income, as shown in table 4:

Table 4

| Year | Income from Rogers Unit | Percentage of taxable income |
|------|-------------------------|------------------------------|
| 1980 | $163,950.72 | 95 |
| 1981 | 113,716.89 | 93 |
| 1982 | 96,226.63 | 87 |

Petitioner never attended a meeting of the Rogers Unit working interest owners; never voted on any matter in connection with the Rogers Unit; never obtained any oil and gas leases (except for inheriting from Cokes); never drilled any oil wells; never supervised any water flood or secondary recovery operations; and never promoted any "oil deals" with anyone else.

---

The working interest owners of the Rogers Unit united in order to conduct a business of oil production by secondary recovery methods (water flood, in particular) on certain real property in Posey County, Indiana.

## OPINION

Respondent contends that petitioner's income received from her working interest in the Rogers Unit is subject to self-employment tax because she was carrying on a trade or business either through an agent or as a partner in a partnership.

Petitioner contends that she is not subject to the self-employment tax because she was not engaged in a trade or business. As support for her contention that she was not engaged in a trade or business, petitioner points out that she is not knowledgeable about oil operations, that she did not participate in the activities of the Rogers Unit, that she played no part in the selection of the Rogers Unit operators during the period in issue, that her interest was a minority interest and that the remaining interest-holders had business or family relationships with each other, and that her "oil income from the Rogers Unit was passive or investment income similar to income from securities, real estate, or trusts."

We agree with respondent that petitioner was a partner in a partnership which was engaged in a trade or business.

Sections 1401(a)[4] and 1401(b)[5] impose taxes on the "self-employment income" of every individual. Section 1402(b) provides in general that "self-employment income" means the "net earnings from self-employment" not in excess of a specified ceiling amount. Section 1402(a)[6] provides, subject to exceptions not herein relevant,[7] that "net earnings from self-employment" includes a partner's distributive share of partnership trade or business income. Accordingly, if petitioner's interest in the Rogers Unit in 1980, 1981, and 1982

---

[4]Sec. 1401(a) provides, in relevant part, as follows:

SEC. 1401. RATE OF TAX.

(a) OLD-AGE, SURVIVORS, AND DISABILITY INSURANCE.—In addition to other taxes, there shall be imposed for each taxable year, on the self-employment income of every individual, a tax as follows:

\* \* \* \* \* \* \*

(3) in the case of any taxable year beginning after December 31, 1978, and before January 1, 1981, the tax shall be equal to 7.05 percent of the amount of the self-employment income for such taxable year;

(4) in the case of any taxable year beginning after December 31, 1980, and before January 1, 1982, the tax shall be equal to 8.00 percent of the amount of the self-employment income for such taxable year;

(5) in the case of any taxable year beginning after December 31, 1981, and before January 1, 1985, the tax shall be equal to 8.05 percent of the amount of self-employment income for such taxable year; \* \* \*

[The subsequent amendment of this provision by sec. 124(a) of the Social Security Amendments of 1983 (Pub. L. 98-21, 97 Stat. 65, 89) does not apply to the instant case.]

[5]Sec. 1401(b) provides, in relevant part, as follows:

SEC. 1401. RATE OF TAX.

(b) HOSPITAL INSURANCE.—In addition to the tax imposed by the preceding subsection, there shall be imposed for each taxable year, on the self-employment income of every individual, a tax as follows:

\* \* \* \* \* \* \*

(3) in the case of any taxable year beginning after December 31, 1978, and before January 1, 1981, the tax shall be equal to 1.05 percent of the amount of the self-employment income for such taxable year;

(4) in the case of any taxable year beginning after December 31, 1980, and before January 1, 1985, the tax shall be equal to 1.30 percent of the amount of the self-employment income for such taxable year; \* \* \*

[The subsequent amendment of this provision by sec. 124(a) of the Social Security Amendments of 1983 (Pub. L. 98-21, 97 Stat. 65, 89) does not apply to the instant case.]

[6]Sec. 1402(a) provides, in relevant part, as follows:

SEC. 1402. DEFINITIONS.

(a) NET EARNINGS FROM SELF-EMPLOYMENT.—The term "net earnings from self-employment" means the gross income derived by an individual from any trade or business carried on by such individual, less the deductions allowed by this subtitle [i.e., subtitle A, which includes the income taxes of ch. 1 and the self-employment taxes of ch. 2] which are attributable to such trade or business, plus his distributive share (whether or not distributed) of income or loss described in section 702(a)(8) from any trade or business carried on by a partnership of which he is a member; \* \* \*

[7]Petitioner does not contend that her income from the Rogers Unit for the years in issue is exempt from the definition of "net earnings from self-employment" because of any of the exceptions contained in sec. 1402(a).

was a partnership interest,[8] then her distributive share of the partnership's trade or business income, will, subject to the limitation of section 1402(b), be subject to the taxes imposed by section 1401 on self-employment income.

Combinations for the purpose of acquiring and exploiting oil and gas properties have been common in the oil industry. Often, the tax status dispute is whether such a combination should be treated as a partnership or as an association taxable as a corporation. See 10 J. Mertens, Law of Federal Income Taxation, sec. 38A.23 (1988).

In 1953, in a unanimous Court-reviewed opinion, we held that a taxpayer who held a one-quarter interest in an oil and gas lease was a participant in a partnership or joint venture, and so an election to currently deduct or to capitalize certain expenditures could be made only by the partnership or joint venture, and could not be made separately by the taxpayer. *Bentex Oil Corp. v. Commissioner*, 20 T.C. 565 (1953).

Assertedly, the *Bentex* opinion was the immediate cause for the enactment of section 761(a) (see *Madison Gas & Electric Co. v. Commissioner*, 72 T.C. 521, 563 (1979), affd. 633 F.2d 512 (7th Cir. 1980); 10 J. Mertens, *supra*, sec. 38A.23, at 48 n. 17), under which the members of an unincorporated association may elect out of subchapter K of chapter 1 (sec. 701 et seq.) under Treasury regulations which meet certain restrictive statutory requirements. See 9 J. Mertens, Law of Federal Income Taxation, sec. 35.02 (1988).

Article XVII of the unit operating agreement, set forth in our findings, *supra*, provides that each working interest owner elects under these regulations to be excluded from subchapter K. However, in our unanimous Court-reviewed opinion in *Bryant v. Commissioner*, 46 T.C. 848 (1966), affd.

---

[8]Sec. 7701(a)(2) provides as follows:

SEC. 7701. DEFINITIONS.

(a) When used in this title [i.e., the Internal Revenue Code of 1954], where not otherwise distinctly expressed or manifestly incompatible with the intent thereof—

\* \* \* \* \* \* \*

(2) PARTNERSHIP AND PARTNER.—The term "partnership" includes a syndicate, group, pool, joint venture, or other unincorporated organization, through or by means of which any business, financial operation, or venture is carried on, and which is not, within the meaning of this title, a trust or estate or a corporation; and the term "partner" includes a member in such a syndicate, group, pool, joint venture, or organization.

399 F.2d 800 (5th Cir. 1968), we concluded as follows (46 T.C. at 864):

When Congress has subtitlized, subchapterized, and sectionized its treatment of a many threaded statutory pattern like the complex Internal Revenue Code, its clear words seem to us a safe guide to meaning. The election under section 761(a) does not operate to change the nature of the entity. A partnership remains a partnership; the exclusion simply prevents the application of subchapter K. The partnership remains intact and other sections of the Code are applicable as if no exclusion existed.

Although *Bryant* involved application of the investment credit to partnerships which had elected out of subchapter K, this Court's above-quoted analysis (which was specifically adopted by the Court of Appeals (399 F.2d at 806-807)) is equally applicable to the self-employment taxes of chapter 2.[9]

Accordingly, article XVII of the unit operating agreement (1) does not serve to prevent us from agreeing with respondent that the unitization agreement and the unit operating agreement created a partnership for purposes of section 1402(a), and (2) does not serve to insulate petitioner from the self-employment taxes.

In *Bentex Oil Corp. v. Commissioner, supra,* two corporations and an individual had jointly acquired an oil and gas lease. The taxpayer had a one-fourth interest, the other corporation had a five-eighths interest, and the individual had a one-eighth interest. The three owners joined together to operate the lease for profit and shared the income and losses in proportion to their respective interests in the venture. The three owners' agreement was entirely oral. The other corporation (the five-eighths owner) received bills for expenses incurred in the operation and development of the lease and at the end of each month billed the other owners for their shares of the expenses and was reimbursed. The taxpayer kept its own books and records. Each of the owners sold its or his share of the production directly to, and received the proceeds therefor directly from, a pur-

---

[9]The discussion of this matter in *Madison Gas & Electric Co. v. Commissioner,* 72 T.C. 521, 559 n. 9 (1979), affd. 633 F.2d 512 (7th Cir. 1980), sets aside for the future how the *Bryant* analysis is to be applied where the controlling statute outside of subch. K does not specifically refer to partnerships. In the instant case, sec. 1402(a) specifically refers to partnerships; thus the instant case falls within the *Bryant* analysis and we have no need to weigh the considerations discussed in the *Madison Gas* footnote.

chaser. We concluded in *Bentex* that the taxpayer was a participant in a partnership or joint venture.

Our *Bentex* analysis was specifically approved in *Madison Gas & Electric Co. v. Commissioner,* 633 F.2d at 515-516, affg. 72 T.C. at 562-565.

While the instant case involves less individual initiative and power for petitioner than was the case in *Bentex,* it does involve formal written agreements among the working interest owners while *Bentex* did not. Both the instant case and *Bentex* involve proportional sharing of costs and of proceeds from sales of the produced oil and gas. In both cases, the group carried on a trade or business, even though in the instant case an individual member of the group may not have been active in the conduct of that trade or business.

In the instant case, neither side contends that the Rogers Unit working interest owners should be treated as an association taxable as a corporation.

We conclude, based on section 7701(a)(2) and *Bentex,* that the Rogers Unit working interest owners constituted a partnership, or a joint venture treated as a partnership. We conclude that, under section 1402(a), petitioner's profits from this activity constitute "net earning from self-employment" and these earnings are subject to the self-employment taxes imposed by sections 1401(a) and 1401(b).

On answering brief, petitioner states as follows:

> The only case cited by Respondent in Section III of the argument of his opening brief dealing with oil was *Bentex Oil Corp. v. Commissioner,* 20 TC 565 (1953), which is no help in the instant case. First, the owners of the working interest never contested the fact they were partners. That wasn't in issue. From the start they admitted they were partners and filed partnership returns. In the instant case the owners of the working interest took the position that they were not partners and never filed partnership returns. Thus, the matter of Petitioner's interest was that of a passive investment in a situation where she was a non-acting co-owner in a unitized oil unit.

It is true that the co-owners in *Bentex* had originally filed partnership tax information returns, but then the taxpayer changed its position.[10] The Court's opinion then describes the dispute as follows (20 T.C. at 571):

---

[10] It also is true that petitioner reported her Rogers Unit income as self-employment income on her 1979 tax return. In addition, at least three other co-owners reported their Rogers Unit income as self-employment income on their tax returns for the years in issue (see text following table 2 *supra*).

Petitioner makes two contentions, the first, and principal one, being that Puig Lease Operations was not a partnership or joint venture and therefore had no right to exercise an option in 1937, 1938, and 1939, and second, assuming it be held to be a partnership or joint venture under the statute, as such it was not a "taxpayer" and consequently had no right to an option under the regulations.

On the facts set out in our Findings of Fact we entertain no doubt as to the answer to the petitioner's first contention and accordingly hold that in the years in question the Puig Lease Operations was a joint venture or partnership within the broad definition of that term in section 3797, Internal Revenue Code [predecessor of sec. 7701, I.R.C. 1954].

Accordingly, we conclude that petitioner's brief on this point blatantly misdescribes the facts, the dispute, and this Court's opinion, in a clearly precedential case.

Petitioner stresses her lack of control of the working interest operations because of the close relationships among the other owners and the operator. The question before us is whether petitioner was a member of a partnership or of a joint venture treated as a partnership, and petitioner's lack of control does not affect that question.[11]

Petitioner contends that "The situation is analogous to a minority interest in a close-held corporation."

The problem is that petitioner (and Cokes) did not put their working interest in a corporation, and, for purposes of the self-employment taxes, the relevant statute makes receipt of distributive share of trade or business income from a partnership (defined expansively in section 7701(a)(2))

---

[11]The report of the Committee on Ways and Means on the Social Security Act Amendments of 1949 (H.R. 6000) explained the provision as follows (H. Rept. 1300, 81st Cong., 1st Sess. 136-137 (1949), 1950-2 C.B. 294):

"The net earnings from self-employment of an individual include, in addition to the earnings from a trade or business carried on by him, his distributive share of the net income or loss from any trade or business carried on by each partnership of which he is a member. * * * [A] partnership which constitutes an association taxable as a corporation * * * is not recognized as a partnership for such purposes. Moreover, only the net income or loss derived by the partnership from carrying on a trade or business is taken into account. Any net income or loss of the partnership derived from sources clearly unrelated to the trade or business carried on by it is excluded in determining the net earnings from self-employment of the partners. The net earnings from self-employment of a partner include his distributive share of the net income or loss of a partnership of which he is a member, irrespective of the nature of his membership, as for example, as a limited or inactive member."

In 1977, the Congress amended sec. 1402(a) to add thereto par. (12), which excludes "the distributive share of any item of income or loss of a limited partner, as such" (sec. 313(b)(3) of the Social Security Amendments of 1977, Pub. L. 95-216, 91 Stat. 1509, 1536). (Sec. 124(c)(2) of the Social Security Amendments of 1983, Pub. L. 98-21, 97 Stat. 65, 90, redesignated par. (12) for taxable years beginning after Dec. 31, 1989.) Petitioner does not contend that the owners of the working interests constituted a limited partnership, nor that she is a limited partner. It appears that, in the words of the 1949 committee report, petitioner may fairly be described as an "inactive member", rather than a limited partner.

generally equivalent to the partner's engagement in a trade or business.

We note that the concept that the character of trade or business income is retained in the partner's hands is not unique to the self-employment taxes area. The unrelated business income tax provisions (sec. 511 et seq.) generally provide that a tax-exempt organization's distributive share of a partnership's unrelated trade or business income is subject to the unrelated trade or business income tax. Sec. 512(c). The report of the House Ways and Means Committee on the bill enacting the unrelated business income tax, reads as follows (H. Rept. 2319, 81st Cong., 2d Sess. 111-112 (1950), 1950-2 C.B. 460):

> In the event an organization to which Supplement U [the predecessor of sec. 511 et seq.] applies is a member of a partnership which is regularly engaged in a trade or business which is unrelated to the functions and purposes of the organization, the organization would include, in computing its unrelated business net income, so much of its share (whether or not distributed) of the partnership gross income as is derived from that unrelated business and its share of the deductions attributable thereto, and make the necessary adjustments for the exceptions and limitations which have been discussed above. For example, if an exempt educational institution is a silent partner in a partnership which runs a barrel factory and such institution also holds stock in a pottery manufacturing corporation, it would include in its unrelated business income its share of the barrel factory income, but not its proportionate share of any dividends received by the partnership from the pottery corporation. If the taxable year of the organization is different from that of the partnership, the amounts to be so included or deducted in computing the unrelated business net income are to be based upon the income and deductions of the partnership for any taxable year of the partnership ending within or with the taxable year of the organization.

The example in the committee report explains that the unrelated business income tax provisions draw essentially the same line as that drawn in the self-employment tax provisions. Interestingly, both statutes were enacted by the 81st Congress. Thus, the statute rejects petitioner's analogy to "a minority interest in a close-held corporation", notwithstanding the passive nature of petitioner's holding.[12]

---

[12]It should be noted that although the "special use valuation" cases (such as *Estate of Ward v. Commissioner*, 89 T.C. 54 (1987), and *Estate of Coon v. Commissioner*, 81 T.C. 602 (1983)) also deal with what constitutes "net earnings from self-employment", those cases depend on a special statutory requirement of "material participation" before there can be

Petitioner relies on *DiPortanova v. United States,* 231 Ct. Cl. 623, 690 F.2d 169 (1982), as support for her contention that she was not a partner in a partnership.

In *DiPortanova,* foreign trusts, which held working interests in U.S. oil and gas reserves, entered into a unit agreement and a unit operating agreement. The trusts held about a 2.27-percent interest in the agreement. The Court of Claims held that the income from the working interests was not "effectively connected with the conduct of a trade or business" within the United States. Because of this holding, the trusts' beneficiary was not taxable at U.S. regular graduated tax rates on the income derived from the working interest.[13] See sec. 871(b)(1).[14]

The opinion in *DiPortanova* does not consider the question of whether the trusts therein were partners in a partnership.[15] Accordingly, *DiPortanova* does not assist petitioner in the instant case.[16]

---

self-employment income under certain circumstances. See secs. 2032A(b)(1)(C)(ii) and 1402(a)(1). Those circumstances do not exist in the instant case. Accordingly, the statutory "material participation requirement" does not apply in the instant case and petitioner may have self-employment income even though she has not materially participated in the operation of the Rogers Unit.

Also, the instant case does not deal with "involuntary unitizations". In the instant case, all the owners of the working interests, or their predecessors, joined in the unitization agreement.

[13]The case was remanded to the Trial Division to determine if the income was nonetheless taxable at regular U.S. tax rates under sec. 877 for the reason that a principal purpose of the taxpayer's renunciation of his U.S. citizenship was the avoidance of taxes.

[14]Sec. 871(b)(1), as in effect for the year in issue in *DiPortanova,* provides as follows:

SEC. 871. TAX ON NONRESIDENT ALIEN INDIVIDUALS.

(b) INCOME CONNECTED WITH UNITED STATES BUSINESS—GRADUATED RATE OF TAX.—

(1) IMPOSITION OF TAX.—A nonresident alien individual engaged in trade or business within the United States during the taxable year shall be taxable as provided in section 1, 402(e)(1), or 1201(b) on his taxable income which is effectively connected with the conduct of a trade or business within the United States.

[15]Sec. 875(1), as in effect for the year in issue in *DiPortanova,* provides as follows:

SEC. 875. PARTNERSHIPS; BENEFICIARIES OF ESTATES AND TRUSTS.

For purposes of this subtitle—

(1) a nonresident alien individual or foreign corporation shall be considered as being engaged in a trade or business within the United States if the partnership of which such individual or corporation is a member is so engaged * * *

Since sec. 875(1) applies to only nonresident alien individuals and foreign corporations, it is not apparent whether the trusts in *DiPortanova,* if they were partners in a partnership, would be considered engaged in a U.S. trade or business if the partnership were so engaged.

[16]In *Hendrickson v. Commissioner,* T.C. Memo. 1987-566, we relied on *DiPortanova v. United States,* 231 Ct. Cl. 623, 690 F.2d 169 (1982). As in *DiPortanova,* it does not appear that the partnership question was dealt with in *Hendrickson.* Accordingly, *Hendrickson* is of no assistance to petitioner on the partnership issue which is the critical question in the instant case. Similarly, our opinion in *Huval v. Commissioner,* T.C. Memo. 1985-568, does not assist petitioner, because *Huval* was based on a regulation (sec. 1.1402(a)-2(b), Income Tax Regs.)

We hold for respondent.

*Decision will be entered for the respondent.*[17]

---

which provides that "income derived from a trade or business carried on by an estate or trust is not included in determining the net earnings from self-employment of the individual beneficiaries of such estate or trust." The instant case does not involve an estate or trust, but rather a partnership as to which the statute and not the regulation provides the rule for decision.

[17]The amounts respondent determined in the notice of deficiency to be self-employment income are somewhat greater, for 1981 and 1982, than the stipulated amounts set forth in table 4 *supra.* The differences are in the amounts of the deductions that petitioner claimed for ch. 1 tax purposes and that respondent did not disallow for those purposes. Since the stipulated amounts set forth in table 4 far exceed the maximum self-employment tax bases for the years in issue (sec. 1402(b)(1) and sec. 230 of the Social Security Act), we need not determine whether the correct amounts are those in table 4 or those in the notice of deficiency, since in either event petitioner is liable for the maximum permissible self-employment taxes.