ETHYLE MOORHEAD, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Moorhead v. Commissioner
Docket No. 8127-92
United States Tax Court
T.C. Memo 1993-314; 1993 Tax Ct. Memo LEXIS 319; 66 T.C.M. (CCH) 149; July 19, 1993, Filed *319 Decision will be entered for respondent. For petitioner: Phil Ridenour.
For respondent: David Monson. PATE
PATE
MEMORANDUM OPINION PATE, Special Trial Judge: This case was assigned pursuant to the provisions of section 7443A(b)(3) and Rules 180, 181, and 182. [1]
Respondent determined a deficiency in petitioner's 1989 Federal income taxes of $ 6,250. The sole issue for our decision is whether petitioner is subject to the self-employment tax on net income from her oil and gas interests. Some of the facts have been stipulated and are so found. Ethyle Moorhead (hereinafter petitioner) filed an individual income tax return for 1989. She resided in Hugoton, Kansas, at the time she filed her petition. Between 1939 and 1945, petitioner's husband, A.C. Moorhead (hereinafter Moorhead), and Panhandle Eastern Pipe Line Co. (hereinafter Panhandle) acquired *320 four contiguous oil and gas leases in which each of them held an undivided one-half interest. On March 22, 1946, Moorhead and Panhandle consolidated their interests in the four leases so that a gas well could be drilled and operated on the property. As a consequence, near the end of 1946, Panhandle drilled a producing natural gas well, known as the Pan-Beckley Gas Well, on the leased property. Prior to drilling, on July 23, 1946, Moorhead entered into an agreement (hereinafter the 1946 agreement) with Panhandle, in which the parties set out the terms and conditions for the drilling, operation, and production of oil and gas on the four leases. The 1946 agreement named Panhandle as "the sole operating manager" and Panhandle agreed to drill a gas well, pay any rentals or royalties due to third parties, and either purchase Moorhead's share of the gas produced or sell his share of the gas to other purchasers at a specified price. Panhandle was charged with collecting the income from the gas sold and paying the expenses attributable to its production. Moorhead agreed to pay Panhandle his proportionate share (50 percent) of charges incurred in drilling and equipping the well and operating *321 costs and expenses, including taxes and insurance. Under the 1946 agreement, Panhandle agreed to provide Moorhead with a monthly statement reflecting the income collected and expenditures made on his behalf. If the statement showed a balance in Moorhead's favor, Panhandle was required to remit the balance due to Moorhead. On the other hand, if the balance was in favor of Panhandle, Moorhead was required to remit such balance to Panhandle. The parties operated under the agreement for almost 15 years. Because Panhandle desired to acquire an additional supply of gas for its pipeline system and Moorhead wanted to further develop his leases, on January 16, 1961, Moorhead and Panhandle entered into a "Gas Purchase and Sales Agreement" (hereinafter the 1961 agreement) which "cancelled" the 1946 agreement "effective at the time this Agreement becomes effective to the extent that gas may be lawfully sold and delivered hereunder". In the 1961 agreement, Moorhead agreed to commit substantially all gas production to the agreement, and Panhandle agreed to purchase a minimum quantity of gas from depths above the base of the Chase Group. The prices Panhandle agreed to pay Moorhead were specified *322 in the agreement. In this connection, Moorhead agreed to perform certain acts, including, among others, to: develop the contract acreage with respect to depths below the base of the Chase Group * * *. * * * [retain] control, management, and operation of the lands, leases, and wells located thereon * * * and * * * the regulation of the flow of gas at the points of delivery * * * [and] within reasonable limits, to regulate the flow of gas to meet * * * [Panhandle's] fluctuating requirements. * * * * * * act with due diligence to obtain and install all equipment required to effect delivery of gas * * *. * * * furnish * * * information concerning acreage changes and geological, engineering, and test data as to existing and new gas wells drilled upon the contract acreage. * * * upon request, to furnish * * * information concerning production, allowables, and proration status with respect to the contract acreage and each well connected under this Agreement. * * * make all necessary filings with the Federal Power Commission * * *. * * * be in control and possession of * * * gas deliverable hereunder and responsible for any damage or injury caused thereby until the *323 same shall have been delivered * * *.
In addition, Moorhead agreed to pay all taxes levied on the gas prior to delivery to Panhandle, and Panhandle agreed to pay all taxes levied after it received the gas. If any new, additional, or increased taxes were levied, each party agreed to pay 50 percent. Panhandle agreed to furnish a statement to Moorhead showing the amount of gas sold during the month and the amount due him and to pay him such amounts by the 25th of each month. If needed, Moorhead had access to Panhandle's books and records to check their accountings to him. Moorhead died in 1962 and devised his interest in the four leases to petitioner. The record is a bit sketchy as to events subsequent to the distribution of the leases to petitioner. However, it appears that, sometime prior to May 1988, Panhandle transferred some of its rights and obligations under the 1961 Agreement to APX Corp. (hereinafter APX). On May 23, 1988, APX sent petitioner a letter proposing to sell, under certain terms and conditions, her share of gas into the spot market pursuant to the terms of the "Joint Operating Agreement". However, because the parties have not submitted to the Court any *324 document entitled "Joint Operating Agreement", we do not know whether this reference was to a subsequent agreement, nor do we know the extent of petitioner's rights or obligations thereunder. However, we do know that petitioner accepted APX's proposal on June 27, 1988, on behalf of the "A. C. Moorhead Heirs". Thereafter, APX entered into a Natural Gas Purchase Agreement with Anadarko Trading Co. (hereinafter ATC). [2] On April 28, 1989, APX wrote petitioner informing her that APX would begin selling its gas to ATC. It stated: With respect to the current arrangements between Ethyle Moorhead and APX under which your working interest share of gas is being sold, APX will continue to honor such arrangement until July 31, 1989. Between now and July 31, 1989, ATC will be soliciting the purchase of your available gas * * * under the same terms and conditions that it is purchasing APX's gas.
*325 Under the Natural Gas Purchase Agreement, ATC contracted with APX and another producer to purchase their combined gas supply. ATC then sent a letter, dated May 1, 1989, to petitioner and others holding interests in various gas wells, proposing that they sign a "Ratification of Natural Gas Purchase Agreement" (hereinafter Ratification Agreement). Basically, the Ratification Agreement incorporated by reference the terms and conditions contained in ATC's Natural Gas Purchase Agreement with APX and, upon acceptance, placed petitioner in a direct contractual relationship with ATC. However, ATC required that APX be named as the "Sellers Representative" for all matters addressed under the agreement. Petitioner signed the Ratification Agreement as "owner". Changes in these arrangements were subsequently made in 1990 and 1991 and such changes were accepted by petitioner. During the year in issue (1989) petitioner was 92 years old and needed some assistance to maintain herself and her household. She was mentally competent and ran her own financial affairs. With her 1989 income tax return, she filed a Schedule C listing her business as "wholesale oil and gas" and reported thereon gross *326 income of $ 138,049 and claimed deductions for depletion of $ 20,707, taxes of $ 9,140, and operating expenses of $ 27,088, resulting in a net profit of $ 81,114. She did not report or pay any self-employment taxes on the reported net profit. In a notice of deficiency, respondent determined that petitioner was subject to self-employment taxes on the net income she reported on Schedule C. However, petitioner contends her age, education, and experience precluded her from actively managing or supervising the Pan-Beckley Gas Well, and, therefore, she was not engaged in a trade or business subject to self-employment taxes. She describes her interest in the four leases as a passive investment. On the other hand, respondent maintains that petitioner was carrying on her trade or business either through an agent or as a partner in a partnership and, therefore, is subject to self-employment taxes on the net profit therefrom. Section 1401 provides for a tax on the "self-employment income of every individual". "Self-employment income" is defined as "net earnings from self-employment" not in excess of a specified ceiling amount. Sec. 1402(b). "Net earnings from self employment" consist *327 of the gross income derived from carrying on a trade or business less deductions properly attributable thereto plus a partner's distributive share of partnership trade or business income. Sec. 1402(a). The phrase "trade or business", as used in section 1402(a), has the same definition as in section 162. Sec. 1402(c). The Supreme Court was faced with defining the phrase "trade or business" as it appears in section 162 in Commissioner v. Groetzinger, 480 U.S. 23 (1987). It observed that, although the phrase is used over 60 times in the Code, no definition is contained in either the Code or the regulations. Id. at 27. The Court observed that "'Business' is a very comprehensive term and embraces everything about which a person can be employed" and is "That which occupies the time, attention, and labor of men [and women] for the purpose of a livelihood or profit." Id. at 27-28 (citing Flint v. Stone Tracy Co., 220 U.S. 107, 171 (1911)). After a review of various definitions, the Court concluded that resolution of whether a taxpayer was engaged in a trade or *328 business requires an examination of the facts and circumstances in each case. In its opinion, the Supreme Court observed that not all profit-making endeavors rise to the status of a "trade or business" and: The income tax law * * * has distinguished between a business or trade, on the one hand, and "transactions entered into for profit but not connected with . . . business or trade" on the other. * * * We accept the fact that to be engaged in a trade or business, the taxpayer must be involved in the activity with continuity and regularity and that the taxpayer's primary purpose for engaging in the activity must be for income or profit. A sporadic activity, a hobby, or an amusement diversion does not qualify. [Id. at 35.]
Nonetheless, a taxpayer need not personally be active in the management or operation of a trade or business for the taxpayer to be subject to self-employment taxes. Price v. Commissioner, T.C. Memo. 1993-265. However, if the taxpayer is not actively involved, the trade or business must have been carried out on his behalf through his agents or employees, or constitute his distributive share of income from a partnership *329 in which he was a member. Sec. 1402(a); secs. 1.1402(a)-2(b), 1.1402(c)-1, Income Tax Regs.
A partnership is broadly defined in the Code as "a syndicate, group, pool, joint venture, or other unincorporated organization, through or by means of which any business, financial operation, or venture is carried on". Sec. 7701(a)(2); see sec. 1.1402(a)-2(f), Income Tax Regs. This definition is broader in scope than its common law meaning. Sec. 301.7701-3(a), Proced. & Admin. Regs. A joint undertaking simply to share expenses is not a partnership, nor is the mere co-ownership of property which is leased. Id. Tenants in common may be partners if they actively carry on a trade, business, or venture and divide the profits therefrom. Id.
In this case, respondent maintains that petitioner was carrying on a trade or business through the use of an agent or as a member of a partnership, whereas petitioner contends that she was a passive investor. As noted earlier, deciding which of the parties is correct is hampered by the fact that the record provides us with very little information about the operation of petitioner's gas interests after 1962. Moreover, although there is a reference *330 in the APX letter to petitioner dated May 23, 1988, to a "Joint Operating Agreement" (under which petitioner ostensibly was operating), that agreement does not appear to be part of the record and, therefore, we have no knowledge of its terms. However, because on brief both parties have taken the position that the 1946 Agreement was canceled by the 1961 Agreement and that during 1989 the 1961 Agreement was the operative agreement from which to determine petitioner's liability for self-employment taxes, we will decide this case based on an examination of the respective rights and obligations of the parties under that agreement. Respondent first maintains that petitioner and Panhandle were engaged in a trade or business as partners in a partnership or joint venture, citing Bentex Oil Corp. v. Commissioner, 20 T.C. 565 (1953), in support thereof. In that case, we had to determine whether the taxpayer was bound, as a member of a partnership or joint venture, by the partnership's election to expense intangible drilling costs. Prior to the year in issue, the taxpayer and two other participants had acquired an oil and gas lease, and then orally agreed to *331 drill a well, produce gas, and share expenses in proportion to their respective interests. Each of the participants sold its share of the production directly to (and received the proceeds directly from) a third party purchaser. Under these facts, we held that the taxpayer was a member of a joint venture and, therefore, was bound by the election made on the partnership return. Id. at 572; see also Madison Gas & Electric Co. v. Commissioner, 633 F.2d 512 (7th Cir. 1980), affg. 72 T.C. 521 (1979). Similarly, in Cokes v. Commissioner, 91 T.C. 222 (1988), the taxpayer entered into a unitization agreement with other owners under which the taxpayer received a 42.29-percent working interest in the unit area. The working interest owners executed a unit operating agreement, which named a unit operator and granted him the exclusive right to develop and operate the unit area to produce oil and gas for the owners. Again, we held that the taxpayer was a partner in a partnership or joint venture carrying on a trade or business, explaining that: While the instant case involves *332 less individual initiative and power for petitioner than was the case in Bentex, it does involve formal written agreements among the working interest owners while Bentex did not. Both the instant case and Bentex involve proportional sharing of costs and of proceeds from sales of the produced oil and gas. In both cases, the group carried on a trade or business, even though in the instant case an individual member of the group may not have been active in the conduct of that trade or business. [Id. at 232.]
The facts of this case present some similarities to those present in both Bentex and Cokes. The 1946 agreement designated Panhandle as the sole operating manager and provided that the parties would share, proportionately, all costs, expenses, and charges, including the drilling of the well. Panhandle was designated to collect the income and remit Moorhead's portion, after expenses, to him. These provisions clearly set up a joint venture under the authority of Bentex and Cokes. The 1961 agreement is markedly different. Under it, Moorhead assumed responsibility for managing and operating the well. He was charged *333 with producing his share of the gas and dedicating his share to Panhandle's pipeline. In return, Panhandle agreed to purchase at least a portion of Moorhead's production at prices specified in the agreement. Most notably, however, the 1961 Agreement does not provide for the parties to share income, costs, or expenses. Given the lack of any provision under which the parties would share the risk or expense of producing or selling the gas, we are hard pressed to find the existence of a joint venture. However, this finding does not end our inquiry. The 1961 Agreement did not set up, as petitioner argues, a joint undertaking simply to share expenses, nor the mere co-ownership of property. Moorhead entered into the 1961 Agreement with Panhandle to sell the gas he produced for a profit. Under the 1961 agreement, Moorhead was responsible to produce his portion of the gas and deliver it to the wellhead. As petitioner points out in her brief -- there is no provision in the agreement for * * * [a third party] operator of the well. Indeed, the contract is very specific in requiring petitioner to remain in charge of her interest in the well and the leasehold estate, and requiring *334 petitioner, not an operator, to manage and operate her interest.
Such gas was produced, apparently on a continuous basis, from 1961 until at least 1991. This clearly shows that Moorhead, and thereafter petitioner, was engaged in the business of producing and selling gas. Countering this argument, petitioner points out that the 1961 agreement- does not state the terms, provisions, and conditions for the drilling or operation of the well, and it deals with production from the well only in so far as necessary to specify the quantity and quality of gas sold from petitioner as seller to Panhandle Eastern as buyer.
She argues that, because the agreement is one for sale of the gas and not for its production, the income derived therefrom is not self-employment income. However, in presenting this argument, petitioner fails to recognize that she had to produce the gas before she could sell it. Because the 1961 agreement provided that Moorhead retain the management and control necessary to produce the gas, the income realized from its subsequent sale was necessarily self-employment income. Finally, petitioner argues that, because she was in her nineties during the year in *335 issue and had neither the education or experience to run a wholesale gas operation, she could not have been engaged in the business of producing and selling gas and, therefore, she did not realize any self-employment income. However, her personal participation is not required for self-employment tax purposes. We need only find that the taxpayer's income was generated by a trade or business operated by herself, her agents, employees, or partners. Although petitioner was elderly during the year in issue and, consequently, may not have been able to personally provide the necessary management and control, we presume that she enlisted the aid of others to render the services necessary to fulfill her obligations under the 1961 Agreement. Although neither party presented us with any evidence as to how these obligations were actually fulfilled, the record does show that petitioner signed various revised agreements with APX and ATC during the 1988 and 1989 time period, lending further credence to such presumption. In conclusion, we find that, because petitioner was obligated under the 1961 Agreement to manage and operate her own interests, she was engaged in the business of producing *336 and selling gas, and the net income produced thereby was derived from a trade or business and therefore constitutes self-employment income. Whether petitioner was personally involved in operating the business or used the services of an agent or employee to achieve that end makes no difference; the net income realized therefrom retains its character as self-employment income. To reflect the foregoing, Decision will be entered for respondent. Footnotes
1. All section references are to the Internal Revenue Code in effect for the year in issue. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. ATC is a wholly owned subsidiary of Anadarko Petroleum Corp. and an "affiliate" of APX. ATC markets natural gas which it purchases from various producers.↩